| | |
|---|---|
| NATHAN BATTLE, | C/A No.: 9:19-cv-1739-TMC-MGB |
| Plaintiff, | |
| vs. | |
| SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; WARDEN CECILIA REYNOLDS, individually and in her official capacity as warden of Lee Correctional Institution; MAJOR BERNADETTE RICHARDSON, individually and in her official capacity as an employee of the South Carolina Department of Corrections; and ANGELA LEATHERWOOD, individually and in her official capacity as an employee of the South Carolina Department of Corrections, | PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS LEATHERWOOD AND SCDC'S MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

Plaintiff, Nathan Battle, responding to Defendants Leatherwood and SCDC's Motion for Summary Judgment, would state as follows:

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff, Nathan Battle, was incarcerated in the South Carolina Department of Corrections on July 15, 2017, and housed at Lee Correctional Institution in Bishopville, South Carolina. On that date, Plaintiff was being housed in the F-2 housing unit on the A-wing where Defendant Angela Leatherwood was the only correctional officer assigned to both the A- and B-wings of the F-2 unit (Exhibit 1: Excerpts of Leatherwood deposition, page 45). Sometime that day, Plaintiff had a conversation with his cellmate that made him feel uneasy, as if trouble was brewing on the wing. Plaintiff took his concerns to Leatherwood who summarily dismissed him and told him to

go back to his cell. Plaintiff followed her instructions and went back to his cell. Shortly after, with Leatherwood off the wing, a fight among inmates ensued leaving one dead and the Plaintiff and several others stabbed and severely injured.

It appears from the SCDC Division of Police Services Investigative Report (Exhibit 2 – Motion to be produced to the Court under Seal) that Defendant Leatherwood had both wing doors open, and inmates from the wings were allowed to go back and forth. (Statements from three other inmates relate that at least one from B-wing was on A-wing getting food, at least one from A-wing was on B-wing getting food, and at least one from F-2 dorm was in the F-4 dorm. Allowing both wing doors to be open and "swinging" and allowing inmates from one wing to come into another wing is a violation of Defendant SCDC's policies and procedures. Inmates from one wing are not supposed to go onto the other wing unless directed to do so by an officer. Inmates also are not supposed to go into other dorms. By doing so the inmate is considered to be out-of-place (Exhibit 3: Deposition of Nathan Battle, page 121-122). Defendant Leatherwood testified that the Post Orders require the wing doors to be locked except during a controlled movement (Exhibit 1, page 38). Housing Post Orders provide that the housing unit officer must "[e]nsure wing doors are secured except while allowing entry or exit." Also, Post Orders specific to Lee Correctional Institution provide that "[i]nmates are not to be permitted to enter a unit or wing except the one they are assigned to…Wing doors are to remain locked at all times, except when allowing inmates to enter or exit during authorized movement…Wing doors in F-2 & F-4 will be opened one at a time for one movement activity at a time" (Exhibit 4: Post Orders, to be submitted under seal). Defendant Leatherwood then left the wing unattended and abandoned her post in violation of Defendant SCDC's policies and procedures (Exhibit 1, deposition of Leatherwood, page 23, lines 1-5; page 47). According to the Plaintiff's deposition, Defendant Leatherwood regularly worked

his dorm. He testified that she was not on the wing at the time of the attacks and customarily did not stay on the wing but stayed in the hallway of the sally port and did not make rounds (Exhibit 3: Excerpts of deposition of Nathan Battle, page 198). Defendant Leatherwood did come onto the wing after Plaintiff and three (3) inmates, who have separate lawsuits filed, were attacked and stabbed. Leatherwood contradicted her story in several ways. She testified that she left A-wing to go to the bathroom. She testified that she came back onto the wing and saw Christian Ray, another inmate who was a victim of the assault[1], being stabbed. But she also testified that when she came out of the bathroom another officer had come into the dorm to take over B-wing and that she gave him the keys for B-wing and then went back onto A-wing. She testified that this occurred during the stabbing (Exhibit 1, page 52). When Defendant Leatherwood came back onto the A-wing, she stood inside the wing door and talked with an inmate at the door. Plaintiff believes that video is available and that it shows Leatherwood standing at the door but said video has not been produced by the Defendant. Upon information and belief, that video was a part of the investigative report. Plaintiff believes that a longer "clip" of that video which shows the door going into and out of the A-wing would also show when and how often Defendant Leatherwood entered and exited the wing. The video shows her then walking toward the entrance of the hallway where she holds her arms out. This is where the Division of Police Services got the still shots they showed SCDC staff to try to get identification of the inmates shown in the video (Exhibit 2).

Defendants did produce a video which showed Defendant Leatherwood letting two inmates off the wing and into the sally port. There is another video clip which shows some of the events which led up to Christian Ray being stabbed. The clip starts out by showing a number of inmates congregating in the center of the "rock" (the inmate name for the common area in the center of the

---

[1] Ray v. SCDC et al, 9:19-cv-00147-TMC-MGB.

lower tier). Christian Ray can be seen coming down the stairway to the right in the video and approaching the group on the rock. His hands are held up in a non-threatening manner and he has nothing in his hands. There appears to be a little bit of conversation between Christian Ray and an inmate identified as Delonte Green. Green is then seen lunging at Ray and hitting him with an object in his hands. Other inmates around Green, some with weapons in their hands, can be seen trying to surround Ray. Ray is seen breaking away and running. Some of the inmates chase after him, and others split apart and begin going up both stairways - the one to the left and the one to the right. The group then congregates at a door on the upper tier and some inmates enter the room. It was determined later that the room was where Plaintiff, Ronnie Drake and Darnell Brown were located and attacked and stabbed.

According to Defendant Leatherwood, two first responders came about five minutes after she called for help, and then one contraband officer responded after about ten minutes (Exhibit 1; Leatherwood deposition, pages 54-55). It wasn't until then that Defendant Leatherwood got some inmates to carry Ray out of the dorm and into the yard to medical. Inmate workers from medical met them with a stretcher and took Ray to medical. (Reference is made to the videos produced with the SCDC Division of Police Services Investigative Report, Exhibit 2) At some point, it was learned that three other inmates, including Plaintiff, had also been stabbed, and they were also taken to medical.

There is contradictory testimony between Defendant Leatherwood and Plaintiff. Plaintiff testified that prior to the onset of the assault, he discussed with inmates Ray, Brown and Drake whether he should say something to Defendant Leatherwood about his conversation with his cellmate, and they told him that he should (Exhibit 4). Battle then approached Defendant Leatherwood who disregarded his requests. *Id*. If Battle's testimony is believed then Defendant

Leatherwood was deliberately indifferent by ignoring his request of assistance when he indicated he felt something was wrong. As such, Defendants are not entitled to Summary Judgment as there are genuine disputes of material facts present in this case.

Plaintiff filed his Summons and Complaint in the Court of Common Pleas for Lee County on May 10, 2019. Defendants then filed a Notice of Removal with State Court documents on June 18, 2019 (ECF # 1, 1-1).

## **LEGAL STANDARD**

The Defendants face a heavy burden in moving for summary judgment. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. Pro.* 56(a). In making this determination, all of the evidence and the inferences therefrom must be viewed in the light most favorable to the Plaintiff. *Mic Automotive, LLC v. Town of Southern Pines*, 532 F.3d 369 (4th Cir. 2008).

Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 534 S.E.2d 688 (2000); *Moriarty v. Garden Sanctuary Church of God*, 334 S.C. 150, 511 S.E.2d 699 (Ct. App. 1999), aff'd, 341 S.C. 320, 534 S.E.2d 672 (2000). "Because it is a drastic remedy, summary judgment should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues." *Carolina Alliance for Fair Employment*, 337 S.C. at 485, 523 S.E.2d at 799. Under Rule 56(c), SCRCP, the party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact. *Carolina Alliance for Fair Employment v. South Carolina Dep't of Labor, Licensing, and Regulation*, 337 S.C. 476, 523795 (Ct. App. 1999). In determining whether any triable issues of fact exist, the evidence

and all reasonable inferences therefrom must be viewed in the light most favorable to the party opposing summary judgment. *Summer v. Carpenter*, 328 S.C. 36, 492 S.E.2d 55 (1997); *Pye v.Aycock*, 325 S.C. 426, 480 S.E.2d 455 (Ct. App. 1997). Because summary judgment is a drastic remedy, it must not be granted until the opposing party has had a "full and fair opportunity to complete discovery." *Dawkins v. Fields*, 354 S.C. 58, 69, 580 S.E.2d 433, 439 (2003); *Lanham*, 349 S.C. at 363, 563 S.E.2d at 334; *Doe v. Batson*, 345 S.C. 316, 322, 548 S.E.2d 854, 857 (2001); *Baird v. Charleston County*, 333 S.C. 519, 529, 511 S.E.2d 69, 74 (1999); *Baughman v. AmericanTel. & Tel. Co.*, 306 S.C. 101, 112, 410 S.E.2d 537, 543 (1991).

I. **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE THE PLAINTIFF HAS ESTABLISHED DELIBERATE INDIFFERENCE ON BEHALF OF THE DEFENDANT ANGELA LEATHERWOOD.**

The Defendants contend that the Plaintiff has failed to meet the burden in establishing deliberate indifference on the behalf of Defendant Angela Leatherwood; this argument fails for several reasons.

The Eighth Amendment to the United States Constitution expressly prohibits the infliction of "cruel and unusual punishments," and imposes a duty on prison officials to provide humane conditions of confinement, including the protection of inmates from violence at the hand of their fellow inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); see also *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety."). Thus, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828. The Defendants generally argue that the Plaintiff has failed to produce any evidence of deliberate indifference. The Plaintiff disagrees.

First, the Plaintiff must show that "a prison official's act or omission [resulted] in the denial

of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Meaning that a Plaintiff must show that due to a prison official's conduct, he suffered serious physical or emotional injury. Here the record reflects that the Plaintiff has suffered serious physical injury as a result of the assault on him which took place at Lee Correctional on July 15, 2017. (See Complaint, ECF 1-1). Second, the Plaintiff must show that the prison official must have had "sufficiently culpable state of mind" which means the official either purposefully caused the harm or acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991).

In this case, Defendant Leatherwood testified that on July 15, 2017, she was a sergeant at Lee Correctional Institution and was assigned that day to work both wings of the F-2 dorm. She testified that she left the A-wing to go to the bathroom in the sally port. She testified that there were about 24 inmates out of their rooms when she left the wing (Ex. 1, page 47). She testified that when assigned to both wings, officers have to go back and forth, "[y]ou go check one wing, do a security check, secure that door, and then go check the other wing, do a security check, and secure that door" (*Id.*, page 40). Leatherwood stated that it would take at least 30 minutes to do a security check so that an officer would be absent from one wing for at least 30 minutes. She admitted that a lot could happen on a wing if there is no officer present for 30 minutes (*Id.*, page 42-43). The log book pages for the correctional officers' log book for the F-2 A-wing were provided in discovery. Those log entries made by Defendant Leatherwood shows that she made an entry every 30 minutes from the time she came on shift through 4:30 p.m. that the "area appear secure" (Exhibit 5 F-2, A wing log book pages). If Defendant Leatherwood was covering two wings and had to go back and forth between wings to conduct rounds, she either did no rounds on the B-wing or the entries in the A-wing log are incorrect, or as Plaintiff testified, she

conducted no rounds and just made incorrect entries in the log book.

Leatherwood testified that when she came back on the wing, she saw Christian Ray being stabbed (*Ex 1*, page 47), but in the videos, it is clear that Ray had already been stabbed when Leatherwood came back onto the wing. Therefore, she could not have witnessed the stabbing. During this timeframe, other inmates had gone upstairs and attacked Plaintiff and two others. There was a lot of movement of inmates going on, and it appears to be more than the 24 inmates that Leatherwood said were out of their rooms. Defendant Leatherwood also allowed another inmate to follow Ray into the hallway. That inmate was later identified by some of the institution's staff in the still shots during the investigation as an inmate that had a weapon. He was later criminally charged for having possession of the weapon. A copy of the warrant is contained in the Division of Police Services Investigative Report (Ex. 2).

Clearly, the best evidence of what happened on A-wing, F-2 dorm, Lee Correctional Institution on July 15, 2017 slightly prior to 5:00 p.m. would be the videos taken by the cameras located in that dorm and in the sally port. A more extended clip of the videos (maybe from the time Defendant Leatherwood came to take over the dorm through the duration of her shift) would also show activity that occurred prior to the stabbings, such as Defendant Leatherwood's movements in and out of the wing and also the movement of others in and out of the wing.

Plaintiff also offers the expert opinions of James E. Aiken. Mr. Aiken stated in his Preliminary Expert Report that:

> "…in a confinement operational context, the Defendants Warden Reynolds, Defendant Richardson, and Defendant Leatherwood were operationally deliberately indifferent, callous, wanton, and grossly negligent in not adhering to basic confinement responsibilities and utilizing their authority to protect Mr. Nathan Battle. Defendants were operationally grossly negligent, deliberately indifferent and clearly failed to provide Mr. Nathan Battle with basic sight and sound supervision, gang management and contraband control

provisions that would, to a reasonable degree of certainty, avoided this life endangerment critical event. This life endangerment critical event were operationally foreseeable, anticipated and avoidable only if the Defendants operationalized basic sight and sound supervision, gang management and contraband control provisions."

Mr. Aiken further noted that:

"If the prison security supervision systems were operating at a basic and elementary level, the likelihood of the critical event of the degree and magnitude occurring would be remote. Defendants did not take fundamental measures to prevent, detect, respond or contain the obvious foreseeable blatant failures prior and during the life endangerment critical event which resulted in the Plaintiff being killed with weapon(s). These operationally gross negligent and deliberate failures resulted in a needless and excessive degree of deadly endangerment to the Plaintiff."

(Exhibit 6: Preliminary Expert Report of Aiken, ECF # 23-1)

Mr. Aiken issued his preliminary report prior to having the opportunity to review the video footage and investigation file obtained from Defendants, however, it is clear that even without review of said evidence, Defendants were deliberately indifferent to Plaintiff.[2]

Furthermore, prior incidents of inmate-on-inmate assault as well as knowledge of gang-related activity at the institution and the serious contraband problems gave Defendant Leatherwood actual or constructive knowledge of the gang- related activities and the risk it posed to inmates such as the Plaintiff. Defendant Leatherwood acknowledged that during the time of this assault, Lee Correctional institution was experiencing a staff shortage (Ex. 1, page 25). She also acknowledged that a lot of things can happen when an officer is absent from a wing, such as fights, robberies of property, beatings and stabbings (*Id*., page 43-44).

Additionally, Plaintiff testified that after his roommate, who is also the inmate charged with murder of Christian Ray, threatened him and told him to move out of the room, he talked

---

[2] Counsel is in the process of providing newly acquired documents to expert such that he may supplement his report if deemed necessary.

with Ray, Brown and Drake, and they encouraged him to go to Defendant Leatherwood and tell her there was going to be trouble. Battle testified that he went out of the wing door which was unlocked and talked to Leatherwood in the sally port hallway where she was sitting and told her that there was trouble brewing. She did not ask him any questions about what kind of trouble but just told him to go back onto the wing. He did and went back upstairs and told his friends that Leatherwood wasn't going to do anything. He testified that at that time, Ray went to talk with Green (the roommate) to try to calm things down. Battle testified that he believed that Leatherwood knew what was going on because she never came back onto the wing until after the stabbings were done (Ex. 3, page 101-135; 183-184).

The evidence creates an inference that Defendant Leatherwood was "aware of the dangerous conditions that had been created at the prison by virtue of [his] . . . customs relating to cell access and freedom of movement, thereby resulting in a dangerous situation to the Plaintiff which ultimately led to his being assaulted." *Hollabaugh v. Cartledge*, No. 9:14-cv-1324-BHH-BM, 2016 WL 11423538, at *8 (D.S.C. Mar. 7, 2016) (denying summary judgment on supervisory deliberate indifference claim where evidence indicated defendant wardens "both knew of and allowed a system to be put in place where inmate cells were unlocked during the course of the day with minimal supervision or oversight, thereby allowing prison inmates unfettered access to other inmate's cells, through which a culture of gang violence and control was able to be imposed on the inmate population"), *adopted by*, 2016 WL 2848370 (D.S.C. May 16, 2016).

Although Defendant Leatherwood asserts that she may not have known specifically that Plaintiff was in danger, she had been alerted to the fact that there were problems brewing on the A-wing of the dorm and that there was a potential for violence to erupt. At the time Plaintiff

notified Defendant Leatherwood of the possibility of problems on the wing, she had the option of going onto the wing to monitor or calling for assistance to ensure that there was an officer on both wings to monitor the wings.  She did nothing.

The Plaintiff's claims for constitutional violations resulting in cruel and unusual punishment  are based on Defendants' deliberate indifferent actions in failing to ensure health and safety of the Plaintiff, in subjecting the Plaintiff to bodily harm and allowing him to be in an uncontrolled violent environment despite having knowledge that it would subject him to harm.

Despite the Defendant's arguments that there is no evidence of a failure to  protect the Plaintiff, Plaintiff has provided ample evidence to establish his Eighth Amendment rights were violated by the Defendants and as such, their claims  under 42 U.S.C § 1983 are proper and the evidence, taken in the light most favorable to the Plaintiff, creates a genuine issue of material fact as to whether Defendant Leatherwood had actual notice or constructive knowledge of the conduct of the inmates, the risks it posed to the inmates, that her response to the risks  was inadequate and showed deliberate indifference, and that there was a link between her deliberate indifference and the injuries suffered by Plaintiff.  There is sufficient evidence for the matter to be submitted to a jury for its determination of the facts. Thus the Defendants' Motion for Summary Judgment must be denied.

## II.      TO THE EXTENT THAT THE DEFENDANTS SEEK DISMISSAL OF CLAIMS PURSUANT TO ELEVENTH AMENDMENT IMMUNITY, DEFENDANTS' MOTION FOR DISMISSAL SHOULD BE DENIED.

The Eleventh Amendment prohibits federal courts from entertaining an action against a state. See, e.g., *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (citations omitted); *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890). Further, Eleventh Amendment immunity "extends to

'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). "As a state agency, SCDC is an arm of the State of South Carolina." *Abebe v. S.C. Dep't of Corr.*, No. 0:09-cv-3111-MBS-PJ, 2010 WL 2991595, at *2 (D.S.C. July 2, 2010), adopted in part, 2010 WL 3258595 (D.S.C. Aug. 16, 2010). "As such, the Eleventh Amendment protects SCDC from suit whether money damages or injunctive relief is sought." *Id.* (citing *Alabama*, 438 U.S. at 782).

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The immunity of a state from suit is a privilege which the state can waive. A state may waive its immunity by participating in litigation. If a state voluntarily agrees to removal of a state is brought into federal court, the Court has held it may not then invoke a defense of sovereign immunity and thereby gain unfair tactical advantage. *Lapides v. Board of Regents*, 535 U.S. 613 (202).

Defendants voluntarily removed this case to federal court, and thereby, waived their immunity from suit in this Court with respect to any claims SCDC would otherwise have been subject to suit in state court. *Lapides v. Board of Regents*, 535 U.S. 613 (2002) ("A State's voluntary appearance in federal court waives sovereign immunity claims where a state has consented to suit in its own courts for such claims."); see also *Cameron v. Cox*, No. 10–1278, 2011

WL 1235308, at * 4 (D.S.C. Jan.21, 2011), adopted by, 2011 WL 1212177 (D.S.C. Mar. 30, 2011). Through enactment of the SCTCA, South Carolina has generally consented to suit for tort claims filed against it in state court. *Briggs v. South Carolina Dept. of Corrections*, No. 13-cv-1348, 2014 WL 1278173 at *21 (Mar. 27, 2014). Since SCDC voluntarily removed this action to federal court, it is subject to suit in this Court for the state law claims asserted against it.

Defendants voluntarily removed the case to federal court thereby waiving the State's Eleventh Amendment immunity from suit in the district court. Citing *Briggs v. South Carolina Dep't of Corrections*, No. 9:13-cv-1348-RMG, 2014 WL 1278173, at 21, states that "because the State of South Carolina 'has by virtue of the SCTCA generally consented to suit for tort claims filed against it in state court, the Defendants' voluntary removal of [t]he case to federal court has waived the State's Eleventh Amendment immunity from suit in [the District Court] for those types of claims.'"

Defendants' Motion for Summary Judgment based upon the Eleventh Amendment should be denied.

### III. DEFENDANT'S MOTON FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED AMENDMENT IMMUNITY.

The Defendants further argue that Defendant Leatherwood is entitled to qualified immunity. Defendants allege that these "government officials" are shielded from liability for civil damages since they were performing discretionary functions, claiming that their action "did not violate clearly established statutory rights of which a reasonable person would have known."

A leading case regarding qualified immunity is the case of *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). That case provides that "government officials performing discretionary functions generally are shielded from liability in civil actions if their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." The purpose of the qualified immunity defense is to enable governmental officials to carry out their jobs free from the fear of civil liability for every mistake they may make, and to protect them from the "expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). at 814.

If there is an issue as to whether the defendant in fact committed a violation of a clearly established law, the defendant is not entitled to qualified immunity. As set forth in *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992), the Court must (1) identify the specific right allegedly violated by a defendant; (2) determine whether at the time of the alleged violation these rights were clearly established; and (3) determine whether a reasonable person in the defendant's position would have known that his actions were in violation of another person's rights.

**1. Failure to Protect.**

The Eighth Amendment to the United States Constitution expressly prohibits the infliction of "cruel and unusual punishments," and imposes a duty on prison officials to provide humane conditions of confinement, including the protection of inmates from violence at the hand of their fellow inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994); see also Makdessi v. Fields, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety."). Thus, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id*. at 828. The Defendants generally argue that the Plaintiff has failed to produce any evidence of deliberate indifference. The Plaintiff disagrees.

First, the Plaintiff must show that "a prison official's act or omission [resulted] in the denial of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Meaning that a Plaintiff must show that due to a prison official's conduct, he suffered serious physical or emotional injury. Here the record reflects that the Plaintiff has suffered serious physical injury as a result of the assault on him which took place at Lee Correctional on July 15, 2017 (See Complaint, See Exhibit 9 and Exhibit 12). Second, the Plaintiff must show that the prison official must have had "sufficiently culpable state of mind" which means the official either purposefully caused the harm or acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991).

Defendants argue that Plaintiff has failed to provide any evidence that would indicate that Defendants had "sufficiently culpable state of mind", however, Defendants provide Plaintiff's deposition testimony which clearly indicates he approached Defendant Leatherwood to provide a warning and request for help due to the risk of harm to his life (Exhibit 4). Defendants fail to recognize that as they assert Plaintiff rights were not violated, they also admit that they took no action to remove the threat that existed to Plaintiff. In addition, Plaintiff alleges that there are numerous issues regarding contraband and gang activity. The Roth Report corroborates Plaintiff's testimony as it indicates high levels of illegal contraband within Lee Correctional (Exhibit 7 and Exhibit 10).

It is clearly established that a person should be free from cruel and unusual punishment under the United States Constitution and it is clear that right existed at the time Defendant Leatherwood allowed Plaintiff to be brutally attacked by other inmates armed with illegal contraband weapons. There is sufficient evidence to submit to a jury for its determination as to

whether Leatherwood neglected her duties and was deliberately indifferent to the safety of all the inmates on F-2, A wing, Lee Correctional Institution, on July 15, 2017 and specifically to Plaintiff.

As set forth above, the knowledge that Lee Correctional was unsafe, coupled with the specific knowledge that Plaintiff was at risk and the failure to do anything to protect Plaintiff from that risk, amounts to the failure to protect Plaintiff, thus his Eighth Amendment rights were violated by the Defendant and as such, his claims under 42 U.S.C § 1983 are proper. Defendant Leatherwood is **NOT** entitled to qualified immunity and his motion should be denied.

## 2. Personal Participation.

The Plaintiff's claims for constitutional violations resulting in cruel and unusual punishment are based on Defendant's deliberate indifferent actions in failing to ensure health and safety of the Plaintiff, in subjecting the Plaintiff to bodily harm, and allowing them to be in an uncontrolled violent environment despite having knowledge that it would subject them to harm. Defendants argue that the record is void of evidence that supports that any Defendant had personal participation in the incidents resulting in the Plaintiff's harm however that is untrue.

Defendant Leatherwood testified herself that she was the only officer on duty on the date of incident (Exhibit 1). Defendant Leatherwood also testified that despite being the only officer on duty that day, she left the A wing unsupervised. *Id.* Defendant left the wing unsupervised despite Plaintiff indicating to her that he felt something bad was going to happen and that she needed to intervene (Exhibit 4). As the officer admittedly on duty during the time of the assault, Defendant Leatherwood cannot claim that she was so far removed that she was not personally involved.

Defendant Leatherwood had personal knowledge of the specific harm the Plaintiff was exposed to and her choosing to do nothing about that specific threat of harm amounted to

misconduct which resulted in the assault that injured the Plaintiff. Thus, the Defendant's Motion for Summary Judgment should be denied.

### 3. Supervisory liability.

Defendants allege that Plaintiff's claims against Defendant Leatherwood are based upon a res ipsa type argument. This is not accurate. The Plaintiff's § 1983 claims against Defendant Leatherwood for her supervisory actions is based, in part, on her alleged supervisory tacit authorization of the unconstitutional conduct and hid alleged implementation of "careless and reckless policies, customs, or practices," including, "failing to prevent inmates from obtaining and possessing dangerous weapons," failing to properly train officers to respond to attacks such as occurred to the Plaintiff," "failing to have a sufficient number of trained correctional officers to adequately respond to incidents such as what occurred to Plaintiff," and "failing to discipline its correctional officers for violations of SCDC policies and procedures." (See generally Complaint.)

"It is well-established that a government official cannot be held liable under § 1983 solely on the basis of respondeat superior." See, e.g., Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Based on the pleadings, it appears Plaintiff is alleging § 1983 claims against Defendant Warden Stephan for both his "personal wrongdoing" and his "supervisory actions." See Harbeck v. Smith, 814 F. Supp. 2d 608, 626–27 (E.D. Va. 2011) ("supervisors can be held liable 'in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms'" (quoting Clark v. Md. Dep't of Pub. Safety & Corr. Servs., 316 Fed. App'x. 279, 282 (4th Cir. 2009)); see also Toomer v. Baltimore City Det. Ctr., No. 12-cv-0083, 2014 WL 4678712, at *5 (D. Md. Sept. 18, 2014) (considering liability of defendant supervisors both for personal liability and supervisory liability).

As discussed above, to find Sgt. Leatherwood personally liable on the basis of failure to protect, Plaintiff must establish that Sgt. Leatherwood knew of a specific threat to Plaintiff's safety and then acted with deliberate indifference to that knowledge. See, e.g., Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 464 (M.D.N.C. 2016) ("Personal involvement and affirmative misconduct or tacit authorization are necessary to establish the direct liability of a supervisor."); Harbeck, 814 F. Supp. 2d at 627 ("To establish [] personal wrongdoing, the individual 'must have had personal knowledge of and involvement in the alleged deprivation of appellant's rights in order to be liable.'" (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir.1985)); cf. Toomer v. Baltimore City Det. Ctr., No. 12-cv-0083, 2014 WL 4678712, at *4 (D. Md. Sept. 18, 2014) ("Any attempt to hold [Defendants] personally liable on the basis of failure to protect is unavailing because Plaintiff's allegations do not support that any of these three Defendants knew of a specific threat to Plaintiff's safety and then acted with deliberate indifference to that knowledge.").

Here, prior incidents of inmate-on-inmate assault as well as knowledge of gang-related activity at the institution and the serious contraband problems gave Defendant Leatherwood actual or constructive knowledge of the correctional officers' conduct, gang-related activities and the risk it posed to inmates such as the Plaintiff. Defendant Leatherwood was in a leadership position and chose to leave wing doors open and to leave inmates unsupervised, both which are clear violations of SCDC policy and basic correctional principles.

The evidence creates an inference that Defendant Leatherwood was "aware of the dangerous conditions that had been created at the prison by virtue of [his] . . . customs relating to cell access and freedom of movement, thereby resulting in a dangerous situation to the Plaintiff which ultimately led to his being assaulted." Hollabaugh v. Cartledge, No. 9:14-cv-1324-BHH-

BM, 2016 WL 11423538, at *8 (D.S.C. Mar. 7, 2016) (denying summary judgment on supervisory deliberate indifference claim where evidence indicated defendant wardens "both knew of and allowed a system to be put in place where inmate cells were unlocked during the course of the day with minimal supervision or oversight, thereby allowing prison inmates unfettered access to other inmate's cells, through which a culture of gang violence and control was able to be imposed on the inmate population"), adopted by, 2016 WL 2848370 (D.S.C. May 16, 2016).

Despite the Defendants' arguments that there is no evidence of deliberate indifference or gross negligence on behalf of the Defendants, the Plaintiff has provided several pieces of evidence that, taken in the light most favorable to the Plaintiff, create a genuine issue of material fact as to whether Defendant Leatherwood had actual notice or constructive knowledge of the risks her conduct posed to the inmates, that her response to the risks was inadequate and showed deliberate indifference, and that there was a link between her deliberate indifference and the injuries suffered by Plaintiff. Thus the Defendant's Motion for Summary Judgment must be denied.

## IV.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE THEY ARE NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.

The Eleventh Amendment prohibits federal courts from entertaining an action against a state. See, e.g., *Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (per curiam) (citations omitted); *Hans v. Louisiana,* 134 U.S. 1, 10–11 (1890). Further, Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity," *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted), because "a suit against a state official in his or her official capacity is not a suit against

the official but rather is a suit against the official's office . . . [and] is no different from a suit against the State itself," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). "As a state agency, SCDC is an arm of the State of South Carolina." *Abebe v. S.C. Dep't of Corr.*, No. 0:09-cv-3111-MBS-PJ, 2010 WL 2991595, at *2 (D.S.C. July 2, 2010), adopted in part, 2010 WL 3258595 (D.S.C. Aug. 16, 2010). "As such, the Eleventh Amendment protects SCDC from suit whether money damages or injunctive relief is sought." *Id.* (citing *Alabama*, 438 U.S. at 782).

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The immunity of a state from suit is a privilege which the state can waive. A state may waive its immunity by participating in litigation. If a state voluntarily agrees to removal of a state is brought into federal court, the Court has held it may not then invoke a defense of sovereign immunity and thereby gain unfair tactical advantage. *Lapides v. Board of Regents*, 535 U.S. 613 (202).

Defendant SCDC voluntarily removed this case to federal court, and thereby, waived their immunity from suit in this Court with respect to any claims SCDC would otherwise have been subject to suit in state court. *Lapides v. Board of Regents*, 535 U.S. 613 (2002) ("A State's voluntary appearance in federal court waives sovereign immunity claims where a state has consented to suit in its own courts for such claims."); see also *Cameron v. Cox*, No. 10–1278, 2011 WL 1235308, at * 4 (D.S.C. Jan.21, 2011), adopted by, 2011 WL 1212177 (D.S.C. Mar. 30, 2011). Through enactment of the SCTCA, South Carolina has generally consented to suit for tort claims filed against it in state court. *Briggs v. South Carolina Dept. of Corrections*, No. 13-cv-1348, 2014

WL 1278173 at *21 (Mar. 27, 2014). Since SCDC voluntarily removed this action to federal court, it is subject to suit in this Court for the state law claims asserted against it.

Defendants voluntarily removed the case to federal court thereby waiving the State's Eleventh Amendment immunity from suit in the district court. Citing *Briggs v. South Carolina Dep't of Corrections*, No. 9:13-cv-1348-RMG, 2014 WL 1278173, at 21, states that "because the State of South Carolina 'has by virtue of the SCTCA generally consented to suit for tort claims filed against it in state court, the Defendants' voluntary removal of [t]he case to federal court has waived the State's Eleventh Amendment immunity from suit in [the District Court] for those types of claims.'"

Defendant SCDC's Motion for Summary Judgment based upon the Eleventh Amendment should be denied.

**V.      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE THE SOUTH CAROLINA TORT CLAIMS ACT DOES NOT BAR PLAINTIFF'S STATE LAW CLAIMS BECAUSE THERE IS EVIDENCE  SCDC and/or ITS EMPLOYEES WERE GROSSLY NEGLIGENT.**

The Defendants argue that the Plaintiff has not presented evidence of gross negligence on  behalf of SCDC and/or its employees, and thus the Plaintiff's claims are barred by the South Carolina Tort Claims Act. Gross negligence means the absence of care that is necessary under the circumstances. The Plaintiff has provided ample evidence that Defendant SCDC and/or its employees acted grossly negligent under the circumstances in each of the Plaintiff's claims.

Specifically there is evidence by Plaintiff's expert which states:

> "…in a confinement operational context, the Defendants Warden Reynolds, Defendant Richardson, and Defendant Leatherwood were operationally deliberately indifferent, callous, wanton, and grossly negligent in not adhering to basic confinement responsibilities and utilizing their authority to protect Mr. Nathan Battle. Defendants were operationally grossly negligent, deliberately indifferent and clearly failed to provide Mr. Nathan Battle with basic sight and sound

supervision, gang management and contraband control provisions that would, to a reasonable degree of certainty, avoided this life endangerment critical event. This life endangerment critical event were operationally foreseeable, anticipated and avoidable only if the Defendants operationalized basic sight and sound supervision, gang management and contraband control provisions."

"Based on the lack of certain materials and validating documents, which typically and objectively signals a failure of the Defendants to meet basic acceptable operating requirements to protect and secure inmates/staff. The sum absence of the above referenced documentation and memorizations further operationally validates gross negligence and deliberant indifference."

"Defendants were placed on specific notice that the institution was in a critical default mode which promoted, facilitated and caused the critical events of life endangerment against Mr. Nathan Battle."

"Defendants ignored clear and precise dangerous critical security precursors/indicators (triggers) that were obviously apparent, clear and precise. These dangerous critical precursor/indicator (triggers) required Defendants to take immediate elementary measures to establish or reestablish their security and safety systems regarding inmate supervision, contraband control, and gang management) thus avoiding the critical events to which Mr. Nathan Battle was a victim of life endangerment physical attacks with the use of weapon(s) and/or other methods of violence.."

"It is of grave intensely that the safety, security, lives of inmates and staff hinges upon basic proper inmate supervision, contraband control and gang management. Dangerous failures occurred at the hands of Defendants created the severe life endangerment critical events which were needless, predictable, interrelated and completely avoidable. These critical failures were operationally grossly negligent, wanton, and minimally defined as deliberate indifference and grossly negligent."

(See Exhibit 6)

Despite these findings, the Defendants specifically argue there is no evidence on the record to support that the Defendants had notice of the Plaintiff's incidents. In addition to Plaintiff's expert's findings, the Court can also take judicial notice that SCDC has been sued *over 160 times* since 2015 for allowing uncontrolled gang violence in SCDC.

Inmates complained in lawsuits that South Carolina's prisons are home to "uncontrolled violence," where there are far too few guards, cells are left unlocked and gangs "run free and commit whatever crimes they want within the  institution without fear of punishment," according to some of the 160-plus lawsuits filed against the state Department of Corrections since 2015.

https://www.usatoday.com/story/news/2018/04/30/prison-riots-and-killings-  rising-states-slash-budgets-guards/545299002/

In short, the uncontrolled gang violence at SCDC *is an on-going* problem that is well known and  has been well known to the Defendants since at least 2015. This, thus, illustrates the pattern and  history of gross negligence on behalf of the Defendants. This is further substantiated by the Roth Report which states in part:

… risk factor that is often associated with staffing levels is the number of assaults that  occur at a facility. The number of staff, staff training and the experience level of staff is often referenced as  one of the causes of prison violence. Although there is no internal or external study that supports  insufficient staffing as the cause of violence, in many cases it may be considered a contributing factor.

Having a sufficient number of well-trained knowledgeable staff assigned to appropriate locations should be  the goal of every facility. The conjecture is that if properly trained staff were present and available as  identified in the recommended staffing plan, the chances an incident resulting in an assault occurs may not  be as high. This may not always be the case however it should be considered a fair assumption.

It has been my experience, most but not all inmates when contemplating committing an assault look for  opportunities to carry out the act without being detected. Having a total of two staff assigned to a 250-bed  unit housing maximum custody inmate containing limited to no electronic surveillance support or having one to two staff members on the courtyard during movement periods creates an environment where the  perceived opportunity to commit an assault, if interested, can initially go undetected. This appears to be  the case at Broad River. There is simply not enough staff supported by available surveillance equipment to consistently cover all the required areas and send the message to the inmate population that when  involved in criminal activity, the risk of being apprehended and the penalty for the same will be great.

(Ex. 7, ROTH Report)

While the Roth Report was not published until 2018, the data that Mr. Roth used to compile his report was available to the employees of SCDC prior to the reports publication because the information contained in the report came from documents supplied to Mr. Roth by SCDC. Plaintiff's expert also provides:

> "The Roth Report further validates the expert opinions, affidavits and deposition testimony I have provided in the above referenced proceedings and other proceedings. The methodology application in determining the proper staffing allotment in the Roth Report represent, in principal, sound correctional practice necessary to determine the minimal and adequate staffing level in order to reasonably establish a safe and secure prison setting."

> "The Roth Report further establishes the redundant critical staff shortages which further causes the chronic and blatant life endangerment critical events reflected in this case. These redundant operational deliberate indifference and gross negligence failures by Defendants to provide basic security and safety is without justification, and/or reasonable excuse."

(See Exhibit 6)

Additionally, Plaintiff has set out extensive testimony showing that Defendant SCDC was aware that it had a severe staff shortage at Lee Correctional Institution, its higher security level facility at the time of the incidents. Defendant Leatherwood testified that she was supposed to be assigned to the yard but for four out of five days a week, she had to be moved to cover a dorm, usually the entire dorm, not just a wing (Ex. 1). Leatherwood testified that when a correctional officer had to cover two wings in a dorm, there could be at least 30 minutes when the officer would be in the other wing and leaving a wing unattended where lots of problems could occur in the officer's absence. Plaintiff testified that Defendant Leatherwood frequently was the correctional officer assigned to the F-2 dorm, usually both wings, and that it was her habit to leave the wing doors unlocked and she would sit in the hallway of the sally port which is located between the wings.(Exhibit 4) If this was a common practice for Defendant

Leatherwood and none of her superior officers were aware of her practice then she was being improperly supervised. The Plaintiff submits that the evidence clearly shows that the Defendants are grossly negligent.

Additionally, in the SCDC Division of Police Services Investigative Report, there are several statements that not only contradict Defendant Leatherwood's testimony that the wing doors were both locked but clearly shows that Defendant Leatherwood allowed inmates from both wings to move between the wings and also allowed at least one inmate to move from one dorm to another dorm. Both of these practices are not supposed to be allowed and Defendant Leatherwood violated SCDC's policies by permitting such movement. That evidence alone indicates that Defendant Leatherwood either left the wing door unlocked or unlocked the doors so that the inmates could move from one wing to the other and back and out onto the yard to travel to a different dorm. This fact alone illustrates the gross negligence on behalf of the Defendants and their inability to enforce and follow their own policies. Defendant Leatherwood in her deposition testifies that she is aware of the gang problem in. This illustrates that there is increased violence and a failure on behalf of the Defendants to properly ensure safety and follow their own policies and procedures (Exhibit. 1).

Because the Plaintiff has provided evidence that the Defendants were grossly negligent, in contrary to what the Defendants argued, the Defendants' Motion for Summary Judgment must be denied as the evidence provided creates a genuine issue of material fact.

**VI.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT MUST BE DENIED BECAUSE MATERIAL QUESTIONS OF FACT EXIST AS TO WHETHER PLAINTIFF EXHAUSTED HIS ADMINISTRATIVE REMEDIES. THE <u>INMATE GRIEVANCE SYSTEM</u> REMEDIES WERE NOT AVAILABLE TO THE PLAINTIFF.**

**<u>SCDC INMATE GRIEVANCE SYSTEM</u>**

SCDC has established an Inmate Grievance System that contains procedures with which inmates are required to comply if they wish to complain about any aspect of prison life (Exhibit 11). Subject to several exceptions, the Inmate Grievance System requires inmates initially to attempt to resolve grievances informally by filing a Request to Staff Member form. Informal resolution is not required, however, when the matter involves allegations of criminal activity. With respect to criminal activity complaints, the inmate must file Form 10-5 Step 1 within five working days of the incident:

> Inmates must make an effort to informally resolve a grievance by submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days. However, in certain cases, informal resolution may not be appropriate or possible (e.g. when the matter involves allegations of criminal activity)....If informal resolution is not possible, the grievant will complete Form 10-5, Step 1 which is located in common areas, i.e., living areas, libraries etc., and will place the form in a designated grievance drop box within five working days of the alleged incident.

(Exhibit 11)(Inmate Grievance System, para. 13.2). Upon receipt of a criminal activity grievance, the Inmate Grievance Coordinator must refer the criminal activity grievance "immediately" to the Chief of the Inmate Grievance Branch for investigation by the Division of Investigations. If it is determined that a criminal investigation is appropriate, the grievance is held in abeyance until the criminal investigation is completed. If a determination is made that criminal investigation is not required, the grievance is processed in accordance with the procedures applicable to non-criminal activity grievances:

> **15. GRIEVANCES ALLEGING CRIMINAL ACTIVITY**:
> Any grievance which alleges criminal activity will be referred immediately to the Chief/designee, Inmate Grievance Branch. The IGC will note on the grievance tracking CRT screen that the grievance has been forwarded to the Inmate Grievance Branch for possible investigation by the Division of Investigations and the date on which the grievance was forwarded. The Chief/designee, Inmate Grievance Branch, will consult with the Division of Investigations to determine if a criminal investigation would be appropriate. If deemed appropriate, the grievance will be forwarded to the Division of

> Investigations, to be handled in accordance with applicable SCDC policies/procedures. The grievance will be held in abeyance until the Division of Investigations completes their review/investigation. If it is determined that a criminal investigation is not required, the grievance will be processed in accordance with the procedures contained herein.

(Exhibit 11)(<u>Inmate Grievance System</u>, para. 15).

If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is required to respond in writing within 45 days and advise the inmate of his right to appeal to the next level:

> 13.5 The Warden will respond to the grievant in writing (in the space provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for the decision rendered and any recommended remedies. The grievant will also be informed of his/her rights to appeal to the next level. The Warden will respond to the grievant no later than 45 days from the date the grievance was formally entered into the OMS system by the IGC.
>
> The response will be served by the IGC to the grievant, within ten (10) calendar days, and the grievant will sign and date the response acknowledging receipt. The IGC will maintain the original grievance for the inmate's grievance file and a copy will be given to the inmate.

(Exhibit 11)(<u>Inmate Grievance System</u>, para. 13.5). The inmate may then appeal by filing a Form 10.5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of receipt of the response. The appeal is referred to the "responsible official" who is required to make a final decision within 90 days. (Exhibit 11)(<u>Inmate Grievance System</u>, para. 13.5).

### A. Defendants' summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiff failed to exhaust his administrative remedies under the Inmate Grievance System.

The Defendants contend that they are entitled to summary judgment because the Plaintiff failed to exhaust his administrative remedies. Defendants allege that Plaintiff failed to informally resolve his complaints about correctional officers allowing inmates to attack the Plaintiff:

> In order to properly exhaust his administrative and state remedies, under SCD C Policy No. GA-01.12, "Inmate Grievance System" …, a prisoner alleging a

wrongdoing by a staff member must first attempt to settle the matter informally by sending a Request to Staff Member (RTSM) to the appropriate staff member within eight (8) working days of the incident.

(Defendants' memorandum in support of motion for summary judgment.)

This argument is not only meritless but is ethically troubling. This statement misrepresents the Inmate Grievance System to the Court. As the Inmate Grievance System clearly provides, informal resolution is not "appropriate" with regard to complaints about criminal activity:

> Inmates must make an effort to informally resolve a grievance by submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days. However, in certain cases, informal resolution may not be appropriate or possible (e.g. when the matter involves allegations of criminal activity)….If informal resolution is not possible, the grievant will complete Form 10-5, Step 1 which is located in common areas, i.e., living areas, libraries etc., and will place the form in a designated grievance drop box within five working days of the alleged incident.

(Exhibit 11)(Inmate Grievance System, para. 13.2).

To the contrary, as previously noted, when allegations of criminal activity are involved (such as they are here), the inmate is required to file a Step I grievance which "immediately" is referred to the Inmate Grievance Chief and the Division of Investigations. (*Id.,*para. 15).

In this case, Plaintiff was attacked by multiple individuals who he believes were members of a gang and stabbed with homemade shanks and other contraband weapons. The gang members conducted this attack within sight and sound of Defendant Leatherwood yet, the assault was not yielded. This attack was after Plaintiff indicated to Leatherwood that he felt unsafe, yet SCDC had done nothing to respond to his attacks. (Exhibit 4) Clearly, these acts were of a criminal nature and the individuals who perpetrated these acts could have and should have been subjected to criminal charges for their actions. It does not matter whether the acts were carried out inside a correctional institution. The acts were criminal.

Accordingly, Defendants' summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiff to attempt to "informally" resolve his complaint about the criminal activity which Defendants allowed to happen to him. Viewing the evidence in the light most favorable to the Plaintiff, informal resolution is not required with respect to the criminal activity which, is the subject of the Plaintiff's lawsuit (assaults by gang members).

**B.      Defendants' summary judgment motion must be denied to the extent that it is based on the failure of the Plaintiff to attempt to file Step I and II grievances because material questions of fact exist as to whether these remedies were "available".**

The Prison Litigation Reform Act does require an inmate to exhaust all *available* administrative remedies prior to filing a 42 U.S.C. § 1983 action arising from prison conditions:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). As previously noted, the Inmate Grievance System requires inmates complaining of criminal activity to file a Step 1 grievance within five days of the incident, and a Step 2 grievance if he is dissatisfied with the resolution of his grievance. But such filing is necessary to exhaust remedies only if these remedies are "available" in the particular case. An inmate need not exhaust administrative remedies that effectively are "unavailable" remedies, not withstanding, that they are listed in the prison grievance policy.

The United States Supreme Court has defined "available" administrative remedies in this context as those remedies that are capable of use to obtain some relief for the action complained of:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust—although significantly different from the "special circumstances" test or

the old CRIPA standard—has real content. As we explained in Booth, the ordinary meaning of the word "available" is " 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.' " 532 U.S., at 737–738, 121 S.Ct. 1819 (quoting Webster's Third New International Dictionary 150 (1993)); …Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of." Booth, 532 U.S., at 738, 121 S. Ct. 1819.

Ross v. Blake, 135 S. Ct. 1850, 1858-59 (2017). The Court has identified three categories where administrative remedies, although on the books, are not "available" within the meaning of the statute. First, an administrative procedure is "unavailable" when correctional officers are unable, or unwilling, to provide any relief to the inmate:

First, … an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates…… Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then "capable of use" for the pertinent purpose. In Booth 's words: "[S]ome redress for a wrong is presupposed by the statute's requirement" of an "available" remedy; "where the relevant administrative procedure lacks authority to provide any relief," the inmate has "nothing to exhaust." … So too if administrative officials have apparent authority, but decline ever to exercise it. Once again: "[T]he modifier 'available' requires the possibility of some relief." … When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.

135 S. Ct at 1859. Second, an administrative procedure is "unavailable" when it is so confusing no reasonable prisoner can make sense of what it demands:

Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. As the Solicitor General put the point: When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available." Tr. of Oral Arg. 23. …When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion. But when a remedy is, in Judge Carnes's phrasing, essentially "unknowable"—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. …Accordingly, exhaustion is not required.

135 S. Ct. at 1859.

The third category encompasses circumstances where prison officials through machination, misrepresentation, or intimidation prevent the inmate from taking advantage of a grievance process:

> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation. In Woodford, we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." 548 U.S., at 102, 126 S. Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable.3 And then, once again, § 1997e (a) poses no bar.

135 S. Ct. at 1860. Custis v. Davis, 851 F.3d 358 (4th Cir. 2017). As will be seen, to the extent that Plaintiff failed timely to file a Step 1 or Step 2 grievance, these remedies were "unavailable" within the meaning of one, or more, of the foregoing three exceptions.

As the Fourth Circuit has explained, a grievance need only be sufficient to alert a prison to the nature of the wrong for which redress is sought:

> The main purpose of the PLRA's exhaustion requirement is "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." Moore, 517 F.3d at 726 (internal quotation marks omitted). Accordingly, to satisfy the exhaustion requirement, grievances generally need only be sufficient to "alert[ ] the prison to the nature of the wrong for which redress is sought." Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002).

Wilcox v. Brown, 877 F.3d 161, note 4 (4th Cir. 2017). The grievances filed thus easily met the standard required for exhaustion. Further, even if the Plaintiff did not in his grievance seek specific remedies and/or policy changes designed to prevent reoccurrence of inmate attacks, such failure

would not make his grievances insufficient. As the Seventh Circuit has explained, no prison system may require the prisoner to specify each remedy later sought in litigation:

> Thus, for example, no administrative system may demand that the prisoner specify each remedy later sought in litigation — for <u>Booth v. Churner</u>, 532 U.S. 731, 121 S. Ct. 1819, 149 L.Ed.2d 958 (2001), holds that § 1997e(a) requires each prisoner to exhaust a process and not a remedy. No comparable doctrine prevents a prison system from requiring factual particularity in an internal grievance.

<u>David v. Strong,</u> 297 F.3d 646, 649-50 (7th Cir. 2002).

Prisoners who are functionally unable to exhaust their claims through no fault of their own may be excused from the PLRA exhaustion requirement. *See, e.g.*, *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016); *Williams v. Paramo*, 775 F.3d 1182 (9th Cir. 2015); *Nunez v. Duncan*, 591 F.3d 1217, 1224–26 (9th Cir. 2010) ("We hold that Nunez's failure to timely exhaust his administrative remedies is excused because he took reasonable and appropriate steps to exhaust his Fourth Amendment claim and was precluded from exhausting, not through his own fault . . . ."). In other words, we have recognized that the PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable." *Nunez*, 591 F.3d at 1226.

Here, Plaintiff testified in his affidavit that he was unable to file a grievance after the assault due to him being transported to the hospital to treat his injuries. (Exhibit 8)[3] Further, once Plaintiff was able, he attempted to receive grievance forms, however none were made available to him. *Id.* Plaintiff, after receiving help from another inmate, was finally able to file his Step 1 grievance, however it was denied and he was never provided with a Step 2. (See Exhibit 8) Defendants assert that because Plaintiff filed a Step 1 grievance untimely that he has failed to exhaust his administrative remedies however they have not provided any documentation in regard to the

---

[3] Counsel, with permission from the Court and Counsel for Defendants, is submitting the un-signed copy of the affidavit due to difficulties securing a notarized signed copy. Counsel will supplement the record with the forthcoming signed copy once received.

outcomes of his attempts to utilize the inmate grievance system. Defendants simply try to pin Plaintiff's own misunderstandings against him despite his testimony regarding his unfamiliarity with grievance process and his need to have someone help him (Exhibit 4). Viewing the evidence in the light most favorable to the Plaintiff, Defendants are not entitled to Summary Judgment because despite Defendants assertions that Plaintiff failed to exhaust his administrative remedies, he was unable to do so because they were both literally and operationally unavailable to him.

## **CONCLUSION**

Taking all evidence is the light most favorable to the plaintiff, there is sufficient issues of material fact which demand that Defendants' Motion for Summary Judgment should be denied.

.

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

_s/ James Edward Bell, III_
J. Edward Bell, III, Fed ID # 1280
Joshua M. W. Salley Fed ID#13214
219 North Ridge Street
Georgetown, SC 29440
TEL.: (843) 546-2408
FAX: (8430 546-9604
jeb@edbelllaw.com

**ATTORNEYS FOR PLAINTIFF**

January 14, 2021
Georgetown, South Carolina