**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | |
|---|---|
| Nathan Battle, )<br><br>PLAINTIFF, )<br><br>v. )<br><br>South Carolina Department of Corrections; )<br>Warden Cecilia Reynolds, *individually and* )<br>*in her official capacity as warden of Lee* )<br>*Correctional Institution*; Correctional )<br>Officer Major Bernadette Richardson, )<br>*individually and in her official capacity* )<br>*as an employee of South Carolina* )<br>*Department of Corrections*; Correctional )<br>*Officer* Angela Leatherwood, *individually* )<br>*and in her official capacity as an employee* )<br>*of South Carolina Department of* )<br>*Corrections*;[1] )<br><br>DEFENDANTS. )<br>_____ ) | Case No. 9:19-cv-01739-TMC-MGB<br><br><br>**REPORT AND RECOMMENDATION** |

This action was filed by Plaintiff Nathan Battle ("Plaintiff"), through counsel, pursuant to

42 U.S.C. § 1983 and the South Carolina Tort Claims Act ("SCTCA"), S.C. Code Ann. §§ 15-78-

10 *et. seq.*[2] (Dkt. No. 1-1.) Plaintiff originally filed this action in the Lee County Court of Common

Pleas on May 10, 2019, and the case was removed to federal court on June 18, 2019. (Dkt. No. 1.)

Currently before the Court is a Motion for Summary Judgment filed by Defendants South Carolina

---

[1] Defendants Cecilia Reynolds and Bernadette Richardson were dismissed from this civil action on October 6, 2020. (Dkt. No. 42.) As such, the only remaining Defendants are the South Carolina Department of Corrections and Correctional Officer Angela Leatherwood.

[2] This case is one of the many actions currently before the undersigned that have been filed by Plaintiff's counsel concerning inmate violence and understaffing at the South Carolina Department of Corrections. *See, e.g. Battle, et al. v. SCDC, et al.*, 2:18-cv-719-TMC-MGB; *Bethel, et al. v. SCDC, et al.*, 4:18-cv-1343; *Crawford v. SCDC, et al.*, 6:18-cv-2407; *Ellerbe v. SCDC, et al.*, 6:19-cv-96; *Murray v. SCDC, et al.*, 6:19-cv-100. On August 13, 2019, the undersigned held a Global Status Conference, in which counsel in all the cases within this category appeared. (Dkt. No. 17.)

Department of Corrections ("SCDC") and Angela Leatherwood ("Leatherwood"). (Dkt. No. 45.) Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Rule 73.02(B)(2)(d), D.S.C., this matter has been assigned to the undersigned for all pretrial proceedings.

For the reasons set forth below, the undersigned recommends that the Court grant Defendants' Motion for Summary Judgment based on Plaintiff's failure to exhaust administrative remedies and remand Plaintiff's state law claims to Lee County.

In the alternative, the undersigned recommends the Court grant in part and deny in part Defendant Defendants' Motion for Summary Judgment on the merits. More specifically, summary judgment should be denied on the merits as to Plaintiff's § 1983 deliberate indifference claim against Leatherwood and Plaintiff's state law claim for gross negligence against SCDC. The remainder of Plaintiff's claims against Leatherwood and SCDC should be dismissed with prejudice.

## BACKGROUND

This civil action arises from an alleged inmate-on-inmate attack that occurred while Plaintiff was incarcerated at Lee Correctional Institution ("Lee") on July 15, 2017. (Dkt. No. 1-1 at 8.) Plaintiff alleges that he was attacked and stabbed by "a group of 4 or 5 inmates who he believes may be members of the Blood gang." (*Id.*) Plaintiff alleges this attack occurred after he had approached Defendant Leatherwood, a correctional officer at Lee, "and told her that he was feeling threatened and felt like someone was out to get him." (*Id.*) According to Plaintiff, Leatherwood "just ignored his concerns" and she "left the wing although all the cell doors were unlocked in violation of Defendant SCDC's policies and procedures." (*Id.*) Plaintiff alleges that Leatherwood left the doors between the wings unlocked "so that the inmates could enter from the

2

other wing." (*Id*. at 9.) Plaintiff alleges that at the same time he was attacked, two other inmates, Darnell Brown and Christian Ray, were also attacked, and Christian Ray died as a result of his injuries. (*Id*.) According to Plaintiff, "other inmates banged on the wing door to get Sgt. Leatherwood's attention and the first responders were finally called." (*Id.*) Plaintiff alleges that he received treatment at Tuomey Hospital and was then returned to Lee. (*Id*.)

According to Plaintiff, "Lee Correctional Institution . . . has a long history of violence among inmates housed in the institution." (*Id*. at 6.) Plaintiff claims that violence is often "encouraged and/or condoned" and that "perpetrators are not punished." (*Id*.) Plaintiff alleges that Lee frequently operates in violation of SCDC's policies and procedures—including SCDC's policy not to allow inmates from one wing onto another wing—and that Defendants failed to keep weapons out of the hands of inmates housed at Lee. (*Id.* at 6–7.)

The Complaint alleges four causes of action:

- First Cause of Action: "For temporary and permanent injunctive relief pursuant to Section 15-45-30 of the South Carolina Code of Laws Ann., 1976, as amended, Rule 65(b) of the South Carolina Rules of Civil Procedure, and 42 U.S.C. Section 1983"; does not specify any particular Defendant;

- Second Cause of Action: "Violation of Civil Rights and 42 USC Section 1983; General Allegations against Defendant Warden Reynolds, Major Richardson, and Sgt. Leatherwood" for *inter alia*, "allowing uncontrolled violence in the correctional institution"; "failing to provide protection and security for the Plaintiff[]"; and "allowing inmate [sic] to have dangerous weapons";

- Third Cause of Action: "Violation of Civil Rights and 42 USC Section 1983; Failure to Implement Appropriate Policies, Customs, and Practices against Defendant Warden Reynolds";

- Fourth Cause of Action: "Violation of Tort Claims Act of South Carolina, S.C. Code Section 15-78-10, *et. seq*.; General Allegations against Defendant SCDC" for the acts of its employees who "acted in a negligent, grossly negligent, reckless, willful and wanton manner in causing injury to the Plaintiff[]"

(Dkt. No. 1-1.) Because Plaintiff voluntarily dismissed Defendants Reynolds and Richardson from this action (Dkt. No. 42), only Plaintiff's claims against Defendants Leatherwood and SCDC remain pending. Plaintiff seeks injunctive relief as well as actual, consequential, special damages, and punitive damages. (Dkt. No. 1-1 at 17.)

Defendants Angela Leatherwood and SCDC filed a Motion for Summary Judgment on December 1, 2020. (Dkt. No. 45.) Plaintiff filed a response in opposition, along with several supporting exhibits and Plaintiff's affidavit,[3] on January 14, 2021. (Dkt. No. 51.) On January 21, 2021, Defendants filed a reply to Plaintiff's response. (Dkt. No. 54.) Defendants' Motion is now ripe for disposition.

## STANDARD OF REVIEW

Defendants seek dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure both on the merits of the claims and on the basis that Plaintiff has failed to exhaust his administrative remedies. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"As the moving party, Defendants are required to identify those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which they believe demonstrate the absence of genuine issues of material fact." *Perez v. Arnold*

---

[3] While the affidavit originally submitted by Plaintiff was unsigned, Plaintiff supplemented the record with a signed version on January 29, 2021. (Dkt. No. 55.)

4

*Transportation*, No. 3:15-CV-3162-TLW, 2018 WL 2301850, at *3 (D.S.C. Feb. 12, 2018)

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "As the nonmoving party, Plaintiff[]

must then produce specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*

*Corp.*, 477 U.S. at 317). "Plaintiffs may not rest on mere allegations or denials; they must produce

'significant probative evidence tending to support the complaint.'" *Id.* (quoting, 477 U.S. at 248).

In other words, "the nonmoving party must go beyond the facts alleged in the pleadings and instead

rely upon affidavits, depositions, or other evidence to show a genuine issue for trial."[4] *Crawford*

*v. Newport News Indus. Corp.*, No. 4:14-cvCV-130, 2018 WL 4561671, at *2. (E.D. Va. Mar. 2,

2018), *adopted in part*, 2018 WL 2943445 (E.D. Va. June 11, 2018), *appeal dismissed sub nom.*

*Kershaw v. Newport News Indus. Corp.*, 2018 WL 8058614 (4th Cir. Oct. 25, 2018). "To survive

a motion for summary judgment asserting he failed to exhaust [his administrative remedies], an

inmate is required to produce competent evidence to refute the contention that he failed to

exhaust." *Noe v. S.C. Dep't of Corr.*, No. 818-CV-00256-DCC-JDA, 2019 WL 2090564, at *3

(D.S.C. Mar. 6, 2019), *adopted by*, 2019 WL 2089275 (D.S.C. May 13, 2019) (citing *Hill v.*

*Haynes*, 380 F. App'x 268, 270 (4th Cir. 2010) (holding that "to withstand a motion for summary

judgment, the non-moving party must produce competent evidence sufficient to reveal the

existence of a genuine issue of material fact for trial")).

In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be

believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v.*

*Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121,

---

[4] The undersigned recognizes that "[i]n this Circuit, verified complaints by *pro se* litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge." *Sweat v. Cook*, No. 9:09-CV-1255-HFF-BM, 2010 WL 1428328, at *1 (D.S.C. Mar. 12, 2010), (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991)), *adopted by*, 2010 WL 1444190 (D.S.C. Apr. 9, 2010), *aff'd*, 402 F. App'x 807 (4th Cir. 2010). However, Plaintiff has had counsel at every step in this action, and the Complaint is not signed by Plaintiff. Accordingly, Plaintiff cannot rely on the Complaint alone to defeat summary judgment.

123–24 (4th Cir. 1990). Although the Court must "draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Sandlands C & D LLC v. Cty. of Horry*, 737 F.3d 45, 54 (4th Cir. 2013) (citing *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.     Exhaustion of Administrative Remedies

Defendants seek dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure both on the merits of the claims and on the basis that Plaintiff has failed to exhaust his administrative remedies. The undersigned considers the exhaustion issue, below.

#### A.     Exhaustion of Administrative Remedy Process

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Through the enactment of this statute, "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures." *Booth v. Churner*, 532 U.S. 731, 741 (2001); *see also Porter v. Nussle*, 534 U.S. 516 (2002).

Exhaustion is defined by each prison's grievance procedure, not the PLRA; a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. *Jones v.*

6

*Bock*, 549 U.S. 199, 218 (2007). An inmate's failure to "properly take each step within the administrative process . . . bars, and does not just postpone, suit under § 1983." *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002); *see also White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997) (upholding dismissal of an inmate's complaint because the inmate failed to proceed beyond the first step in the administrative grievance process). The Defendants bear the burden of proving the affirmative defense that Plaintiff failed to exhaust available administrative remedies regarding his claims. *Jones*, 549 U.S. at 212. Once they have done so, the burden of proof shifts to Plaintiff to show, by a preponderance of the evidence, that the administrative remedies were unavailable to him through no fault of his own. *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (citing Moore, 517 F.3d at 725). "[J]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Woodhouse v. Duncan*, 741 F. App'x 177, 178 (4th Cir. 2018).

The SCDC grievance procedure is outlined in SCDC Policy GA-01.12 ("Inmate Grievance System"). (Dkt. No. 51-9.) Subject to certain exceptions, the Inmate Grievance System requires that inmates initially attempt to resolve grievances informally by "submitting a Request to Staff Member Form to the appropriate supervisor/staff within eight (8) working days of the incident." (*Id.* ¶ 13.2.) Informal resolution is not required, however, when "the matter involves allegations of criminal activity." (*Id.*) With respect to criminal activity complaints, the inmate must file Form 10-5 Step 1 within five working days of the alleged incident. (*Id.*) The Inmate Grievance System provides:

> Any grievance which alleges criminal activity will be referred immediately to the Chief/designee, Inmate Grievance Branch. The IGC will note on the grievance tracking CRT screen that the grievance has been forwarded to the Inmate Grievance Branch for possible investigation by the Division of Investigations and the date on which the grievance was forwarded. The Chief/Designee, Inmate Grievance Branch, will consult with the Division of Investigations to determine if a criminal

investigation would be appropriate. If deemed appropriate, the grievance will be forwarded to the Division of Investigations, to be handled in accordance with applicable SCDC policies/procedures. The grievance will be held in abeyance until the Division of Investigations completes their review/investigation.

(*Id.* ¶ 15.) If it is determined that a criminal investigation is not required, the grievance will be processed in accordance with the procedures applicable to non-criminal activity grievances. (*Id.*)

If an inmate files a Step 1 grievance that does not involve criminal activity, the Warden is required to respond in writing within 45 days and advise the inmate of his right to appeal to the next level:

The Warden will respond to the grievant in writing (in the space provided on SCDC Form 10-5, Step 1), indicating in detail the rationale for the decision rendered and any recommended remedies. The grievant will also be informed of his/her rights to appeal to the next level. The Warden will respond to the grievant no later than 45 days from the date the grievance was formally entered into the OMS system by the IGC. The response will be served by the IGC to the grievant, within ten (10) calendar days, and the grievant will sign and date the response acknowledging receipt. The IGC will maintain the original grievance for the inmate's grievance file and a copy will be given to the inmate.

(*Id.* ¶ 13.5)

The inmate may then appeal by filing a Form 10-5(a) Step 2 appeal to the Inmate Grievance Coordinator within five days of the receipt of the response. (*Id.* ¶ 13.7) The appeal is referred to the "responsible official" who is required to make a final decision within 90 days. (*Id.*) The Inmate Grievance System provides,

As part of the Department's final answer to a grievance, the inmate will be notified that any further appeal must be initiated within 30 days after receipt of the Department's final answer. This appeal must be contained on the South Carolina Administrative Law Court "Notice of Appeal" that will be attached to the Department's final answer and must be sent to the Administrative Law Court. Instructions regarding completion of the form, and information indicating where the form must be sent, will also be provided to the inmate.

(*Id.* ¶ 13.9)

**B.    Unavailability of Administrative Remedy and Notice**

8

As discussed below, it is undisputed that Plaintiff did not exhaust his administrative remedies in accordance with the Inmate Grievance System. Accordingly, Plaintiff must show, by a preponderance of the evidence, that the administrative remedies were unavailable to him. *Graham*, 413 F. App'x at 663. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). To prove unavailability, the inmate must "adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure." *Graham*, 413 Fed. App'x at 663. "The district court is 'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.'" *Zander v. Lappin*, 415 F. App'x 491, 492 (4th Cir. 2011) (quoting *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)).

In *Ross v. Blake*, the Supreme Court set forth three scenarios where the administrative process is considered "unavailable": (1) the administrative process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the administrative process is so opaque that no ordinary prisoner can discern or navigate through the process; and (3) the "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation." 136 S.Ct. 1850, 1853–54 (2016).

The examples provided in *Ross* with respect to the first scenario indicate that a deficiency of this type would be systemic or widespread, or at least not isolated. *See Ross*, 136 S. Ct. at 1859 (giving the following examples of when an administrative remedy is a dead end: when a prison handbook directs inmates to submit their grievances to a particular administrative office, but in practice that office disclaims authority to consider them; or when administrative officials have

apparent authority but decline ever to exercise it). With respect to the third scenario, *Ross* seems to require that, to prevail on an assertion that prison officials thwarted his efforts to exhaust, an inmate must be able to demonstrate something more than isolated negligence on behalf of prison officials. *Id.* at 1860 n.3 (citing cases where correctional facilities staff misled the inmate about the existence of a process or its rules; used threats or intimidation; or misled him into thinking he had done everything necessary to use the process).

Also, the Fourth Circuit Court of Appeals has held that "to satisfy the exhaustion requirement, grievances generally need only be sufficient to alert the prison to the nature of the wrong for which redress is sought." *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017). In *Wilcox*, the plaintiff prisoner had submitted to the district court "a copy of the Step-Three decision of the Inmate Grievance Resolution Board disposing of his grievance" objecting to the cancellation of certain religious services. 877 F.3d at 166. The Fourth Circuit held that the plaintiff was not required to submit an additional grievance when the prison, after resolution of the initial grievance, agreed to restart the services, then made a second decision to cancel the services. *Id.* at 167 n.4. The court reasoned that the initial grievance provided the prison with "notice of, and an opportunity to correct, a problem," which "satisfied the purpose of the exhaustion requirement." *Id.* (quoting *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013)).

**C.     Analysis**

In support of their arguments that Plaintiff has failed to exhaust his administrative remedies, Defendants rely on Plaintiff's deposition testimony, (Dkt. Nos. 45-2; 54-1), and Plaintiff's responses to certain discovery requests (Dkt. No. 54-2). In response, Plaintiff cites his affidavit testimony (Dkt. No. 55), as well as his deposition testimony (Dkt. No. 51-3). Plaintiff was deposed on October 11, 2019 (Dkt. No. 54-1), and his affidavit is dated January 22, 2021 (Dkt.

No. 55). Having carefully reviewed the evidence relevant to the exhaustion issue, the undersigned makes the following recommendations:

The parties cite the following portion of Plaintiff's deposition testimony as relevant to the exhaustion issue:

- Plaintiff testified that upon his incarceration in 2013, he learned about SCDC's policies and procedures regarding filing a grievance and filing a request to staff. (Dkt. No. 54-1 at 43–44.)

- When asked if he talked to any SCDC staff about the incident at issue, Plaintiff responded that he did not "because you got COs [correctional officers], these COs are crooked back here . . . [T]hey tell the inmate what's going on." (*Id.* at 163.)

- Plaintiff testified he filed a grievance in 2018, and he was told it was denied because Plaintiff "filed it too late." (*Id.* at 163.)

- Plaintiff testified that his 2018 grievance was "[a]bout letting them know, I tried to let Leatherwood know what was going on and she didn't do nothing about the situation and I feel like she had something to do with it, because she didn't came to the Rock. She didn't came to the Rock until after the fact, after the whole situation done died down after we done, all four of us done got stabbed and saw Christian Ray sitting there, laying there, dying. That's when she call First Response." (*Id.* at 163.)

- Plaintiff testified that after his grievance was denied, he "didn't know what to do after that." (*Id.* at 162.) He testified, "I don't like to do grievances, because I really don't know how to do it, but I just did it that one time, because I tried to learn how to do it so I could explain my situation and I had one individual try to show me how

11

to do it, but they still denied it. So I . . . . [did not go] to step 3 or step 2 because I didn't know what else to do." (*Id.* at 98.)

- Plaintiff acknowledged he had the option "to do a step 2 if step 1 was denied," and testified, "I just didn't know how to do it, because I got shipped here after they denied me. I got shipped and so I didn't know what else to do, because I didn't— when I first got here, I didn't know how—I didn't know nobody and I wasn't talking to nobody at the time until I got a little comfortable with some people, because I don't like everybody. I like to observe people first before I talk to you . . . to see what type of person you are. . . ." (*Id.* at 99.)

The parties also cite the following portion of Plaintiff's affidavit testimony as relevant to the exhaustion issue:

- Plaintiff averred that he "was unable to file a grievance directly after the assault because I was transported to the hospital. Upon my return from the hospital, despite fear of retaliation by the gang and SCDC personnel, I made several attempts to receive grievance forms however they were never made available to me." (Dkt. No. 55 at 2.)

- According to Plaintiff, "[t]he grievance process is not confidential" and he knows this because he has "personally heard correctional officers talking about grievance filed by other inmates." (*Id.*)

- Plaintiff averred that "[o]nce I was transferred, I filed a step 1 grievance on or about March 14, 2018, stating that on July 15, 2017, I told Sgt. Leatherwood I did not feel safe and she just looked at me and left the wing, allowing the gang to attack me." (*Id.* at 2–3.)

12

- Plaintiff averred he "was never provided a Step 2 grievance after my Step 1 and no Step 2 grievance forms were readily available to me." (*Id.* at 3.)

- According to Plaintiff, "I believe the reason that my grievances were not processed properly was to allow officers to avoid scrutiny for their actions." (*Id.*)

Finally, Defendants have submitted certain discovery responses from Plaintiff (Dkt. No. 54-2) as well as Plaintiff's inmate detail report (Dkt. No. 54-3). Plaintiff's answers to Defendants' First Set of Interrogatories include the following:

> 10. Set forth with specificity each and every attempt the Plaintiff had made to resolve the alleged conditions, with specific regard to the allegations at issue in your Complaint, through the SCDC Internal Grievance Procedure.
>
> **ANSWER: Plaintiff did not file any Requests to Staff or grievances because he did not know the procedure. Once he knew, he attempted to file, but it was denied because of timeliness. Plaintiff reserves the right to supplement this answer.**

(Dkt. No. 54-2 at 6.) Plaintiff's inmate detail report shows that he returned to Lee from "outside medical" on July 16, 2017, the day after the assault occurred. (Dkt. No. 54-3.) Between September 14, 2017 and May 14, 2019, Plaintiff has moved among several SCDC correctional institutions including, Perry, Broad River, McCormick, and Tyger River. (*Id.*)

Here, it is undisputed Plaintiff failed to exhaust his administrative remedies following the incident at issue—there is no evidence in the record that Plaintiff submitted a Step 2 grievance.[5] While the parties agree Plaintiff submitted a Step 1 grievance, the actual grievance has not been filed in the record.[6] Because Plaintiff did not exhaust his administrative remedies, Plaintiff's

---

[5] Citing section 13.2 of the Inmate Grievance System, Plaintiff asserts that the informal resolution requirement was excepted because his complaint was about criminal activity; specifically, an assault by multiple inmates. (Dkt. No. 51 at 28.) In their reply brief, Defendants concede that that "an informal resolution of the grievance is not required in these circumstances." (Dkt. No. 54 at 10.) Accordingly, Plaintiff's failure to file a request to staff member regarding this incident does preclude finding exhaustion. Rather, Plaintiff only needed to file a Step 1 grievance to begin the administrative process.

[6] Defendants assert that "[a]ll of Plaintiff's 'request to staff' and grievances were produced to Plaintiff by Defendant SCDC during discovery." (Dkt. No. 54 at 13.) Thus, it appears both SCDC and Plaintiff possessed the step 1 grievance

federal claims can only survive summary judgment if there is at least a genuine issue of material fact as to whether the grievance process was unavailable to him.

In his brief, Plaintiff asserts that the grievance process was unavailable because the Step 1 grievance form was not made available to him in a timely manner and "he was never provided with a Step 2" grievance form. (Dkt. No. 51 at 32.) He averred to these statements in his January 29, 2021 affidavit. (Dkt. No. 55.) More specifically, Plaintiff averred that his hospitalization prevented the timely filing of his Step 1 grievance and when he returned from the hospital, he "made several attempts to receive grievance forms, however they were never made available to" him. (*Id*. at 2.) Plaintiff was eventually able to file a Step 1 grievance, but he apparently took no action after it was denied. With respect to the Step 2 grievance, Plaintiff averred that he was never provided a Step 2 grievance "after [his] Step 1" and no Step 2 grievance forms were readily available to him. (*Id*. at 3.)

In their brief, Defendants argue that Plaintiff's affidavit testimony should not be given any persuasive weight because it contradicts Plaintiff's earlier deposition testimony wherein Plaintiff did not mention any difficulty in receiving grievance forms at any stage in the appeals process. (Dkt. No. 54 at 9–13.) Upon careful consideration, the undersigned cannot find that Plaintiff's affidavit testimony directly contradicts his deposition testimony such that it should not be considered by the Court. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that *flatly contradicts* that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." (emphasis added)). Plaintiff's deposition testimony is silent

---

at issue, yet chose not to put it in the record. Plaintiff has offered testimony about the contents of his Step 1 grievance, and Defendants do not dispute Plaintiff's account.

on the issue of the accessibility of grievance forms to Plaintiff following his assault—his testimony does not imply that these forms were readily available to him.

However, even with due consideration of Plaintiff's affidavit testimony, there is no basis to find that the grievance process was unavailable in this instance. Plaintiff appears to argue that the grievance process operated as a dead end because he could not access the requisite grievance forms. While Plaintiff averred that he made several unsuccessful attempts to receive grievance forms after he returned from the hospital, he ultimately was able to file a Step 1 grievance. Even if the Court excused the untimely filing of this grievance, Plaintiff still failed to submit a Step 2 grievance. Critically, there are no facts indicating Plaintiff was prevented, through no fault of his own, from obtaining a Step 2 grievance form. *Graham*, 413 F. App'x at 662 ("[I]n order to show that a grievance procedure was not 'available,' a prisoner must adduce facts showing that he was prevented, through no fault of his own, from availing himself of that procedure.").

The Supreme Court has described a "dead end" administrative process scenario as one "with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S.Ct. 1850, 1853–54 (2016). With respect to the Step 2 grievance forms, Plaintiff has averred that he was never provided with this form and no such forms were "readily available." (Dkt. No. 55 at 2.) Upon review, the record does not specify how SCDC inmates obtain Step 2 grievance forms, and Plaintiff does not claim he ever asked any SCDC officials for this form. While the grievance forms may not have been "readily available," this does not necessarily mean that the forms were withheld from inmates when requested. The record does not indicate Plaintiff ever asked for a Step 2 grievance form or suggest that this form was in some way withheld from Plaintiff.

Indeed, Plaintiff's deposition testimony indicates Plaintiff expressly chose not to ask about the grievance process after his Step 1 grievance was denied. In other words, there is no evidence that SCDC officials were "unable to or consistently unwilling to provide any relief" to Plaintiff with respect to the grievance process. Because Plaintiff has not met his burden to produce evidence that his administrative remedies were unavailable for any of the reasons recognized in *Ross* or controlling Fourth Circuit precedent, Plaintiff's federal claims should be dismissed for failure to exhaust. *See*, *e.g.*, *State v. S.C. Dep't of Corr.*, No. 0:17-CV-3326-MGL-PJG, 2019 WL 3773867, at *8 (D.S.C. Aug. 9, 2019) (finding lack of exhaustion where even assuming the plaintiff timely filed a Step 1 grievance, the plaintiff "did not avail himself of the next step in the grievance procedure and file a Step 2 grievance") *adopted by*, 2019 WL 3780141 (D.S.C. Aug. 9, 2019); *Williams v. Reynolds*, No. 4:12-CV-138-RMG, 2013 WL 4522574 at * 4 (D.S.C. Aug. 27, 2013) (Noting that "even if Plaintiff did file a Step 1 grievance that was returned unprocessed, there is no evidence that Plaintiff filed a Step 2 grievance or otherwise appealed the decision not to process the Step 1 grievance").

Here, the undersigned recognizes that the administrative grievance procedure may have been futile to Plaintiff, where he seeks protection from future harm and monetary damages for past harm. However, exhaustion of administrative remedies is a mandatory process that is required "even though the relief sought is not attainable through resort to the administrative remedy procedure." *Stokes v. Davis*, No. CV JKB-16-3239, 2018 WL 656445, at *6 (D. Md. Feb. 1, 2018). Indeed, the Supreme Court has held that "an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *Booth*, 532 U.S. at 741 n.6. Thus, the undersigned is constrained to recommend summary judgment be granted to Defendants as to Plaintiff's federal claims based on Plaintiff's failure to exhaust administrative remedies.

Should the district court agree with this recommendation, the undersigned further recommends the district court decline to exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(c)(3). *See* § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if– . . . (3) the district court has dismissed all claims over which it has original jurisdiction."). The undersigned's recommendation for dismissal of Plaintiff's federal claims is based on the interpretation of the PLRA, a federal statute, rendering the above findings inapplicable to Plaintiff's state law claims. While Defendants argue Plaintiff's claims also fail to satisfy the state statutory exhaustion requirements, the undersigned finds such an analysis would be more appropriately undertaken by the state court in the first instance. Indeed, courts overwhelmingly remand state law claims when the federal claims have been dismissed for failure to exhaust administrative remedies. S*ee also Simpson v. S.C. Dep't of Corr.*, No. 2:17-CV-3031-RMG, 2019 WL 4254228, at *5 (D.S.C. Sept. 9, 2019) (granting summary judgment on federal claims for failure to exhaust, declining to exercise supplemental jurisdiction over the remaining state law claims and remanding the state law claims to state court noting, "there is no indication that remanding the state law claims would inconvenience or unfairly prejudice the parties, nor does the Court find any underlying issues of federal policy involved in these state law claims"); *Johnson v. Ozmint*, No. 9:08-CV-0431-PMD-BM, 2009 WL 252152, at *6 (D.S.C. Feb. 2, 2009) (dismissing federal claims for failure to exhaust administrative remedies and noting, "With respect to these remaining state law causes of action, when federal claims presented in a case which has been removed to federal court from state court are dismissed, the case should be remanded to state court for resolution of any remaining state law claims . . . ."). Accordingly, the undersigned recommends that the Plaintiff's state law claims be remanded to Lee County.

## II.     Consideration of the Merits of Plaintiff's Claims

Although the undersigned recommends Plaintiff's federal claims be dismissed based on failure to exhaust administrative remedies and the district court remand Plaintiff's state law claims, the undersigned will address the merits of Plaintiff's claims in an abundance of caution. In support of their Motion for Summary Judgment, Defendants argue that: (1) Plaintiff's claims are barred by the Eleventh Amendment; (2) Plaintiff's Fourteenth Amendment claims are actually Eighth Amendment claims; (3) Plaintiff failed to produce evidence of Defendant Leatherwood's deliberate indifference; (4) Defendant Leatherwood is entitled to qualified immunity; (5) Defendant SCDC is immune from suit under the SCTCA; (6) Plaintiff has failed to present sufficient evidence to support a showing of gross negligence on behalf of Defendant SCDC; and (7) Plaintiff's claim for injunctive relief fails as a matter of law. (Dkt. No. 45-1.)

As an initial matter, Plaintiff does not acknowledge Defendants' argument that his claim for injunctive relief fails as a matter of law.[7] Indeed, his brief does not mention this claim at all. Accordingly, the undersigned recommends finding that Plaintiff has conceded to the dismissal of this claim and that the claim for injunctive relief be dismissed on this basis. *See*, *e.g.*, *Waiters v. Sci. Applications Int'l Corp.*, No. 2:17-CV-3227-BHH-BM, 2019 WL 5874132, at *10 (D.S.C. May 10, 2019) (stating that plaintiff abandoned claim by failing to address in his memorandum in opposition to defendant's motion to dismiss argument raised in defendant's motion to dismiss), *adopted by*, 2019 WL 4462810 (D.S.C. Sept. 18, 2019); *Baker v. Warden, FCI Williamsburg*, No. 5:14-CV-1006-BHH-KDW, 2014 WL 8382936, at *3 (D.S.C. Dec. 17, 2014) ("a litigant's failure to respond to a specific point proposed by his opponent as a basis for summary judgment amounts

---

[7] In their motion, Defendants argue that the claim for injunctive relief is moot because Plaintiff is no longer housed at Lee. They also argue that Plaintiff has not shown he will suffer irreparable harm if an injunction is denied. (Dkt. No. 45-1 at 28–29.)

to a concession to the opponent's position on that point"), *adopted by*, 2015 WL 1423293 (D.S.C. Mar. 27, 2015); *Campbell v. Rite Aid Corp.*, No. 7:13-CV-02638-BHH, 2014 WL 3868008, at * 2 (D.S.C. Aug. 5, 2014) ("Plaintiff failed to respond to [Defendant's] argument regarding causes of action 1 and 2, and the Court can only assume that Plaintiff concedes the argument."); *Jones v. Family Health Ctr., Inc.*, 323 F.Supp.2d 681, 690 (D.S.C. 2003) (noting that claim not addressed in opposition memorandum had been abandoned).

The undersigned considers Defendants' remaining arguments, below.

## A.    Eleventh Amendment Immunity

As described above, Plaintiff alleges a § 1983 failure to protect claim for monetary damages against Defendant Leatherwood in her official and individual capacities. (Dkt. No. 1-1.) Plaintiff also brings state law claims against Defendant SCDC. (*Id.*) Defendants assert that Plaintiffs' § 1983 claims brought against Defendant Leatherwood in her official capacity are barred under the Eleventh Amendment. (Dkt. No. 45-1 at 12.) Plaintiff responds that because Defendants voluntarily removed the case to federal court, they waived their immunity from suit. (Dkt. No. 51 at 12.)

Eleventh Amendment immunity "extends to 'arm[s] of the State,' including state agencies and state officers acting in their official capacity." *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (alteration in original) (internal citations omitted). Accordingly, "[s]tate officials may only be sued in their individual capacities." *Rhoden v. S.C. Dep't of Corr.*, No. 4:17-CV-2537-HMH-TER, 2017 WL 9288217, at *3 (D.S.C. Oct. 4, 2017) (finding claims against prison warden in his official capacity should be dismissed because warden is entitled to Eleventh Amendment immunity), *adopted by*, 2017 WL 5494126 (D.S.C. Nov. 16, 2017), *amended*, 2017 WL 6032341 (D.S.C. Dec. 6, 2017); *Edwards v. Patell*, No. 4:06-CV-0748-HFF-TER, 2007 WL 2428548, at *8

19

(D.S.C. Aug. 21, 2007) (dismissing claims brought against defendant "employee of SCDC" in his official capacity). "As a state agency, SCDC is an arm of the State of South Carolina." *Abebe v. S.C. Dep't of Corr.*, No. 0:09-CV-3111-MBS-PJ, 2010 WL 2991595, at *2 (D.S.C. July 2, 2010), *adopted in part*, 2010 WL 3258595 (D.S.C. Aug. 16, 2010).

Notably, by voluntarily removing a case to federal court, a defendant waives any immunity from suit in federal court with respect to any claims it otherwise would have been subject to in state court. [8] *Lapides v. Board of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) ("A State's voluntary appearance in federal court waives sovereign immunity for claims where a state has consented to suit in its own courts for such claims."); *see also Cameron v. Cox*, No. 1:10-CV-1278-HFF-SVH, 2011 WL 1235308, at * 4 (D.S.C. Jan. 21, 2011), *adopted by*, 2011 WL 1212177 (D.S.C. Mar. 30, 2011). Through enactment of the SCTCA, South Carolina has generally consented to suit for tort claims filed against it in state court. *Briggs v. S.C. Dept. of Corrections*, No. 9:13-CV-1348-RMG, 2014 WL 1278173, at *21 (Mar. 27, 2014).

Based on the foregoing, the undersigned recommends that the Eleventh Amendment bars Plaintiff's § 1983 claims for monetary damages brought against Defendant Leatherwood in her official capacity. However, because SCDC voluntarily removed this case to federal court and South Carolina has consented to suit for tort claims filed against it in state court, SCDC is subject to suit in this Court for the state law claims asserted against it.

### B.     Constitutional Claims against Defendant Leatherwood

---

[8] Such voluntary removal does not waive a defendant's immunity to any § 1983 claims, however. *See Passaro v. Virginia*, 893 F.3d 243, 248 (4th Cir. 2019) (rejecting argument that the Commonwealth waived its sovereign immunity to a Title I claim by removing case to federal court); *Stewart v. North Carolina*, 393 F.3d 484 (4th Cir. 2005) (holding that where a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court).

In the Complaint's Second Cause of Action, Plaintiff alleges that Defendant Leatherwood committed constitutional violations pursuant to § 1983. (Dkt. No. 1-1 at 11–13.) Plaintiff alleges that Defendant Leatherwood violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. (*Id*.) More specifically, Plaintiff alleges that Defendant Leatherwood "acted in a negligent, grossly negligent, reckless, willful, wanton [sic] and with a deliberate indifference in causing injury to the Plaintiff" by, *inter alia*, "allowing uncontrolled violence in the correctional institution"; "failing to provide protection and security for the Plaintiff"; and "allowing inmate[s] to have dangerous weapons." (*Id*.) Plaintiff also alleges that Defendant Leatherwood "fail[ed] to comply with SCDC policies and procedures." (*Id*.)

As an initial matter, because Plaintiff is a state prisoner and not a pre-trial detainee, his allegations of deliberate indifference and failure to protect implicate the Eighth Amendment's proscription against cruel and unusual punishment, not the Fourteenth Amendment's requirement of due process.[9] *Bowman v. Ozmint*, No. 0:08-CV-2517-PMD-PJG, 2009 WL 3065180, at *12 (D.S.C. Sept. 22, 2009) ("[A]s Bowman is a state prisoner and not a pre-trial detainee, his allegations of deliberate indifference and failure to protect implicate the Eighth Amendment's proscription against cruel and unusual punishment . . . not the Fourteenth Amendment's requirement of due process."), *aff'd*, 369 F. App'x 416 (4th Cir. 2010); *see also Heyward v. Price*, No. 6:18-cv-00150-JMC, 2019 WL 1416880, at *5 (D.S.C. Mar. 29, 2019) ("Although Plaintiff has alleged a violation of rights under the Fourth, Eighth, and Fourteenth Amendments, he is a convicted prisoner and, therefore, only the Eighth Amendment is relevant to the court's analysis."),

---

[9] Technically, the Fourteenth Amendment is applicable but only to the extent that the Eighth Amendment protection against infliction of cruel and unusual punishments is enforced against states through the Fourteenth Amendment. *See Hewins v. Loftis*, No. 6:15-CV-04320-MGL-JDA, 2016 WL 11410920, at *5 (D.S.C. May 19, 2016), *adopted by*, 2016 WL 4035461 (D.S.C. July 28, 2016).

*aff'd in part, vacated in part, remanded*, 785 F. App'x 109 (4th Cir. 2019); *James v. S.C. Dep't of Corr.*, No. 3:08-CV-0664-HFF-JRM, 2009 WL 1147994, at *4 (D.S.C. Apr. 27, 2009) ("Defendants have analyzed Plaintiff's claims under the Fourteenth Amendment. Plaintiff, however, appears to have been a convicted inmate at the time of the alleged incidents such that his claims are properly analyzed under the Eighth Amendment."). Accordingly, the undersigned recommends granting Defendant Leatherwood summary judgment on any claims for violation of Plaintiff's Fourteenth Amendment rights.

In light of the foregoing, it is clear that Plaintiff's § 1983 claims for violation of his constitutional rights should be analyzed under the Eighth Amendment. Before analyzing the merits of Plaintiff's § 1983 claims under the Eighth Amendment, the undersigned sets forth certain relevant legal standards.

### 1.    Legal Standard

The Eighth Amendment requires prison officials to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Officials must take "reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In other words, "[t]he government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. Nonetheless, "[t]he burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408–09 (7th Cir. 2014) (citing *Whitley v. Albers*, 475 U.S. 312, 325 (1986)). Not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Instead, the Supreme Court has outlined two requirements for an Eighth Amendment failure to protect claim. First, "a prison official's act or omission must result in the denial of 'the minimal

civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In other words, the denial of the prisoner's constitutional rights must be "sufficiently serious." *Id*. at 825; *see also Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014) ("a prisoner must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury") (internal quotation marks omitted). Second, the prison official must have a "sufficiently culpable state of mind," which means the official either purposefully caused the harm or acted with "deliberate indifference." *Farmer*, 511 U.S. at 825  (quoting *Wilson v. Seiter*, 501 U.S. 294, 297–303 (1991). A prison official demonstrates deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

A prison official is deliberately indifferent if he has actual knowledge of a substantial risk of harm to a prisoner and disregards that substantial risk. *Id*. at 847; *Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (observing that "deliberate indifference" requires actual knowledge and disregard of a substantial risk of serious injury). A prison official is not liable if he or she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844; *see also Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (finding that a prison official was not liable, because he did not actually draw the inference that the inmate was exposed to a substantial risk of serious harm). A showing of mere negligence does not qualify as deliberate indifference. *Davidson v. Cannon*, 474 U.S. 344, 347 (1986); *see Whitley*, 475 U.S. at 319 (("[C]onduct that does not purport to be punishment at all must involve more than ordinary lack of due care . . . . [O]bduracy and wantonness, not inadvertence . . . characterize the conduct prohibited by [the Eighth Amendment]."); *see also Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991) (citing Fourth Circuit cases adopting the Supreme Court's reasoning in *Whitley*).

A prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842. The Fourth Circuit Court of Appeals has reiterated that the subjective knowledge component is nuanced. *See Makdessi v. Fields*, 789 F.3d 126, 137–38 (4th Cir. 2015) (finding that the district court failed to appreciate nuances with respect to this component). The Fourth Circuit acknowledged that the "'actual knowledge' standard required to find prison officials deliberately indifferent to a substantial risk of serious injury may be proven by circumstantial evidence." *Id*. at 129. "Prison officials may not simply bury their heads in the sand and thereby skirt liability." *Id.* "Rather, they may be held accountable when a risk is so obvious that it had to have been known." *Id*. Therefore, "'even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious.'" *Id.* at 133 (quoting *Brice v. Virginia Beach Corr. Ctr.,* 58 F.3d 101, 105 (4th Cir. 1995)); *see also Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (May 6, 2019) ("[A]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate." (quoting *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011)).

In short, direct evidence of actual knowledge is not required. *Farmer*, 511 U.S. at 842. The question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "'risk of serious damage to his future health' . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether

a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843 (quoting *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

However, because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware of an obvious risk to inmate health or safety. For example, they may show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, "even if the harm ultimately was not averted" because a prison official's duty is to ensure "reasonable safety." *Id.* (quoting *Helling*, 509 U.S. at 33). This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)) (Kennedy, J.). Absent successful rebuttal, prison officials may be held liable for obvious risks they must have known. *Makdessi*, 789 F.3d at 133 (citing *Farmer*, 511 U.S. at 842).

## 2.    Arguments and Relevant Evidence

As discussed above, a prison official is deliberately indifferent under the Eighth Amendment if he has actual knowledge of a substantial risk of harm to a prisoner and disregards that substantial risk. *Farmer*, 511 U.S. at 847. The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842).

Here, Defendants argue that Plaintiff's failure to protect claim against Defendant Leatherwood must fail because Leatherwood was not aware of any substantial risk of harm to Plaintiff. (Dkt. No. 45-1 at 10.) Defendants further argue that there is no evidence Leatherwood "could have taken any action to control the alleged staffing deficiencies of SCDC." (*Id.* at 11.) Plaintiff contests Defendants' arguments, asserting that Defendant Leatherwood knew of a substantial risk of harm to Plaintiff because Plaintiff warned her "there was trouble brewing." (Dkt. No. 51 at 10.) Plaintiff also asserts that "prior incidents of inmate-on-inmate assault as well as knowledge of gang-related activity at the institution and the serious contraband problems gave Defendant Leatherwood actual or constructive knowledge of the gang-related activities and the risk it posed to inmates such as the Plaintiff." (*Id.* at 9.) In support, Plaintiff cites the following evidence: (1) Plaintiff's deposition testimony; (2) Leatherwood's deposition testimony; (3) certain Post Orders from SCDC;[10] (4) the expert opinion report submitted by Plaintiff's expert, James Aiken; and (5) the "Roth Report," a report drafted by Tom Roth in connection with a settlement of another case against SCDC that focuses on staffing levels at SCDC.[11]

Below, the undersigned summarizes the evidence in the record that is particularly relevant to the § 1983 claims against Leatherwood.

---

[10]   The Post Orders submitted by Plaintiff all post-date the incident at issue by almost one year. (Dkt. No. 51-2.) There is no evidence in the record that these documents were in effect at the time of the incident and, therefore, the undersigned does not consider them to be relevant to this case.

[11]   The undersigned notes that Plaintiff submitted the following sealed evidence in support of his response to Defendants' motion: (1) the investigative file from SCDC's Division of Police Services investigation into this incident, and (2) video surveillance footage depicting the aftermath of the attack. (Dkt. No. 53; Dkt. No. 59; Dkt. No. 60.) In the video footage, Defendant Leatherwood emerges from the door to "the rock" after inmate Ray has been attacked. She then assists him out the "F2 Entry A Side Door." The footage shows Defendant Leatherwood standing just inside the side door (in a small area between the side door and the actual entrance to "the rock") at the time of the stabbing. Although the footage is not entirely clear, Defendant Leatherwood appears to be facing away from "the rock" at the exact time of the stabbing and appears to turn and walk out onto "the rock" a few seconds later. Because the footage begins only a few seconds before Ray is stabbed, the footage is not useful in determining whether Plaintiff approached Defendant Leatherwood prior to the attack. The undersigned does, however, note that there is no mention of Plaintiff approaching Defendant Leatherwood in the Voluntary Written Statement he provided in connection with SCDC's Division of Police Services investigation. (Dkt. No. 59 at 481–82.)

- **Plaintiff's Deposition Testimony**

In his deposition, Plaintiff described the events leading to the assault at issue and his alleged conversation with Leatherwood prior to the assault. (Dkt. No. 54-1 at 101–3.) Specifically, Plaintiff testified that he was getting ready to cook with some friends including inmates Darnell Brown and Christian Ray. (*Id*. at 101.) According to Plaintiff, "one of the Bloods came to the door" and told Plaintiff his roommate needed to talk to him. (*Id*. at 102.) Plaintiff eventually spoke with his roommate, wherein the roommate told Plaintiff he needed "to get out of the room, you don't clean." (*Id*. at 103.) At this point, Plaintiff knew "something ain't right" and the roommate was "basically trying . . . to put it down on me." (*Id.*) Plaintiff continued,

> So I went to Leatherwood and I [tried] to let Leatherwood know [what was] going on. . . . [She] was running the dorm at the time. So I went to her and let her know what was going on and she was . . . like, oh, you're all right, just go back to the dorm. I said all right. I went back to the dorm. I went back upstairs to finish cooking and stuff and the other guy, my friend [Christian Ray], he went to see what was going on, because I told him the situation. . . . [N]ext thing you know, . . . I came out of the room, that's when he start[ed] stabbing him. . . .

(*Id*.) Plaintiff testified that he was stabbed four times after trying to help Ray. (*Id*.) Plaintiff testified that Leatherwood was not "on the Rock when the situation happened" and she "was off the dorm." (*Id*. at 104.)

When asked if Defendant Leatherwood asked Plaintiff why he thought something was going to happen, Plaintiff responded "No, ma'am, she [didn't] ask none of that. She just was like go back on the wing." (*Id*. at 113.) He further stated:

> I told her that something [wasn't] right, I [felt] uncomfortable, [I felt] like something was about to happen and she was like what [do] you think [is] going to happen and I was like . . . something [is] about to happen and that's when she just was like, well, if you [aren't] trying to tell me what [is] about to happen, just go ahead and get back on the wing . . . .

(*Id*.)

When asked where Defendant Leatherwood was located when Plaintiff first approached her, Plaintiff replied: "[s]he was in the hallway . . . off the wing where they can't see [anything]." (*Id*. at 115.) He explained that he was able to reach her in the hallway because the door was open. (*Id*.) Plaintiff described that he had not seen Leatherwood on the wing at all that day, stating: "[s]he was in the hallway the whole time. Every time she work[s], that's where she [sits]. She sit[s] in the hallway every time she work[s]." (*Id*.) He also noted that, when Defendant Leatherwood is working, "she [doesn't] lock the doors . . . [she leaves] all the doors open and walk[s] off the wing." (*Id*. at 140.)

Plaintiff stated that he "[felt] like Leatherwood [knew] what was going on, because she [wasn't] on the Rock not one time. She [didn't come] on the Rock, did no round or [anything] one time." (*Id*. at 111–12.) He further explained that he felt like Defendant Leatherwood was aware of the impending attack because she allowed "another inmate off another wing that [she knew was] a Blood," even though inmates "[aren't] supposed to be on both sides of the wing, . . . [it's] not supposed to happen like that." (*Id*. at 121.)

- **Leatherwood's Deposition Testimony**

In her deposition, Defendant Leatherwood testified that on the day of the assault, she was the only officer assigned to the two wings in Plaintiff's dorm. (Dkt. No. 51-1 at 6.) She testified that she had gone to the bathroom, and when she returned, inmate Ray was being stabbed. She further testified that "during the stabbing," another officer came to the unit and took over the B side of the wing. (*Id*. at 8.) According to Leatherwood, Ray ran towards her, and she stood between Ray and the inmates who were chasing him. (*Id*. at 9.) Leatherwood testified that she pushed Ray off the wing and secured the door. The first responders arrived approximately five minutes later.

28

(*Id*.) Leatherwood acknowledged that the "post orders" require that wing doors stay locked except during a controlled movement. (*Id*. at 5.)

- **Plaintiff's Expert Report**

Plaintiff has submitted an expert report drafted by his expert James Aiken, a former Warden, Deputy Warden, and Deputy Regional Administrator in South Carolina. Mr. Aiken has over 48 years of experience "in correctional administration, facility operations/management, inspection/assessment of facility performance and technical assistance consultations." (Dkt. No. 51-5 at 34.) In his expert report, Mr. Aiken opines that "Defendants were placed on specific notice that [Plaintiff] was in a life endangerment peril prior to the critical event by the mere fact that Lee Correctional Institution is a high security prison containing persons that will inflict violence upon [Plaintiff] when basic inmate supervision, contraband control and gang management were in failure mode." (*Id*. at 16.) Mr. Aiken further opines that "Defendants ignored clear and precise dangerous critical security precursors/indicators (triggers) that were obviously apparent, clear and precise." (*Id*.)

Mr. Aiken states that he considered certain documents to render his opinions, including information contained in: (1) the Roth Report; (2) *Security Audit Program; Lee Correctional Institution; SCDC; September 21-September 24, 2015,* (at Security Compliance 91088 to 91126); (3) *SCDC Quarterly Report of Confiscated Property* (dated July 31, 2016 through December 31, 2016); (4) *SCDC, Lee Correctional Institution, Warden's Staff Meeting – Agendas*; and (5) *Lee Correctional Institution, 2017 Quarterly Internal Audit, 1st Quarter Audit*. (*Id*. at 8–11, 17–27.) However, Mr. Aiken does not provide any evidence that Defendant Leatherwood would have been exposed to the information contained in these materials.[12] He provides no detail about the agendas

---

[12] The undersigned does not find persuasive the legal conclusions contained in Mr. Aiken's report. *See United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal

from the Warden's Staff Meeting, merely stating, "The Warden's meeting agendas operationally do not validate that essential and basic elements of inmate protection and security were addressed in an objective and productive manner." (*Id.* at 22.)

Finally, Mr. Aiken notes that he reviewed Plaintiff's deposition testimony. More specifically, Mr. Aiken states that he focused his review of this testimony on "ascertaining the tactics, methods and definitive objective outcome productivity of Defendants regarding perilous security failures." (*Id.* at 26.) Mr. Aiken states that "[a] review of the testimony did not produce validation that elementary actions were taken by Defendants to prevent, detect, respond and contain the obvious life endangerment failures they knew would cause repetitive and interconnected violent attacks." (*Id.* at 26–27.)

- **Roth Report**

The Roth Report is dated March 2018 and includes a detailed 20-page analysis of staffing issues specific to Lee, including on how staffing at Lee has impacted the number of contraband related incidents and incidents of assault from 2015 through 2017. The Roth Report states that "[s]ecurity staffing levels have been a critical concern at Lee for an extended period. . . . [A] significant decrease in front-line security (FLS) staffing levels began in 2012 and had continued to decline through the middle of 2017." (Dkt. No. 65-10 at 98.) In connection with this staffing shortage, the Roth Report conveys concerns regarding the number of contraband incidents and inmate-on-inmate assaults at Lee. (*Id.* at 102−03.) For example,

> At Lee there has been several significant weapon related incidents, including incidents resulting in the death of an inmate. Reports reflected a stabbing has

---

conclusion by applying law to the facts is generally inadmissible."). For example, Mr. Aiken opines that "Defendants Warden Reynolds, Defendant Richardson, and Defendant Leatherwood were operationally deliberately indifferent, callous, wanton, and grossly negligent in not adhering to basic confinement responsibilities and utilizing their authority to protect Mr. Nathan Battle." (Dkt. No. 51-5 at 13.)

occurred at the facility in 2009, 2016, 2017 and 2018, resulting in an inmate death.
. . . .

Having a total of between one and two staff assigned to a 250-bed housing unit which contains limited to no electronic surveillance support or having one staff member on the courtyard during movement periods, creates an environment where the perceived opportunity to commit an assault can initially go undetected. This appears to be the case at Lee. There is simply not enough staff supported by available surveillance equipment to consistently cover all the required areas and send the message to the inmate population that when involved in criminal activity the risk of being apprehended for the same will be great.

At Lee as previously mentioned an assault resulting in the death of an inmate occurred in 2009, 2016, 2017 and 2018. This is an extremely high number of fatal incidents for any facility. The total number of assault related incidents reported in 2017 were less than the overall average and less than the two previous years. . . . [A]ssaults still occur; however, at a higher than acceptable level. It is of considerable concern that in the past three years at least one homicide has occurred at the facility.

(*Id*.)

Having considered the relevant evidence put forth by the parties, the undersigned will analyze the § 1983 claims against Leatherwood.

### 3.    Analysis

Construing the evidence in the record in the light most favorable to Plaintiff, the undersigned finds there is a genuine issue of material fact as to whether Leatherwood knew of and disregarded a substantial risk of harm to Plaintiff when she allegedly ordered Plaintiff to return to his cell and left the wing with the doors unlocked. More specifically, Plaintiff's deposition testimony indicates that just prior to the attack, he told Leatherwood that "something [wasn't] right" and he felt "uncomfortable." Leatherwood then left the wing unattended with the doors unlocked. Defendants have not offered any evidence to dispute this version of events. Plaintiff's deposition testimony indicates Leatherwood had at least an "inkling that the attack was going to occur." *James v. Cartledge*, No. 9:15-CV-0625-TLW-BM, 2016 WL 1448557, at *7 (D.S.C. Mar. 2, 2016) (granting summary judgment on § 1983 deliberate indifference claim against prison

correctional officer who abandoned his post at the time of an attack because "Plaintiff has presented no evidence that Goble was aware that he was in danger from attack on the date at issue, or had any inkling that the attack was going to occur"), *adopted by*, No. 9:15-cv-00625-TLW, 2016 WL 1427381 (D.S.C. Apr. 12, 2016), *aff'd*, 669 F. App'x 674 (4th Cir. 2016). Further, construing the evidence in light most favorable to Plaintiff, there is an issue of fact as to whether Leatherwood acted with obduracy and wantonness, rather than merely with the absence of ordinary lack of due care. *See Whitley*, 475 U.S. at 319 ("[C]onduct that does not purport to be punishment at all must involve more than ordinary lack for due care . . . . [O]bduracy and wantonness, not inadvertence . . . characterize the conduct prohibited by [the Eighth Amendment]."). Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment be denied with respect to Plaintiff's § 1983 failure to protect claim against Defendant Leatherwood.[13]

The undersigned further recommends that Defendant Leatherwood is not entitled to qualified immunity. It has long been established that prison officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners. *See Farmer*, 511 U.S. at 833. Questions of fact exist with regards to whether Defendant Leatherwood violated Plaintiff's Eighth Amendment rights, as discussed above; therefore, the undersigned cannot determine at this time whether her actions were objectively reasonable. *See, e.g., Crawford v. S.C. Dep't of Corr.*, No. 6:18-CV-02407-DCN-MGB, 2020 WL 7000864, at *26 (D.S.C. June

---

[13] This recommendation does not hinge on Plaintiff's argument that "prior incidents of inmate-on-inmate assault as well as knowledge of gang-related activity at the institution and the serious contraband problems gave Defendant Leatherwood actual or constructive knowledge of the gang related activities [at Lee] and the risk it posed to inmates such as the Plaintiff." (Dkt. No. 51 at 9.) Plaintiff fails to cite any evidence indicating that Defendant Leatherwood knew of the severity of these problems prior to Plaintiff's assault. (*See* generally Dkt. No. 51.) While Plaintiff has submitted the Roth Report, there is no evidence that Leatherwood was exposed to any information contained in the Roth Report prior to the assault. Further, Mr. Aiken's expert report does not provide persuasive evidence on this issue. In short, there is no compelling evidence showing that Defendant Leatherwood was exposed to information concerning a longstanding, pervasive, and well-documented risk to inmates, and thus 'must have known' about it.'" *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

11, 2020) (denying summary judgment on qualified immunity grounds where questions of fact existed regarding whether defendants' actions were reasonable), *adopted by*, 2020 WL 5835073 (D.S.C. Oct. 1, 2020); *Kane v. Beaufort Cnty. Sheriffs Dep't*, No. 9:14-CV-508-RMG, 2015 WL 404570, at *5 (D.S.C. Jan. 29, 2015) ("summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants" (quoting *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 180 (4th Cir. 1998)). As such, the undersigned recommends that the Court deny Defendant Leatherwood summary judgment on the grounds of qualified immunity. *See*, *e.g.*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (Defendant entitled to qualified immunity only insofar as the conduct alleged did not violate clearly established statutory or constitutional rights of which a reasonable person should have known); *Newkirk v. Enzor*, 674 F. App'x. 276 (4th Cir. 2017) (affirming denial of summary judgment on qualified immunity where facts remained in dispute); *Wynn v. Perry*, No. 3:14-CV-625-FDW, 2018 WL 1077321, at *29 (W.D.N.C. Feb. 27, 2018) ("It has long been established that prison officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners.").

### C.    State Law Claims against SCDC

Plaintiffs also bring state law claims against Defendant SCDC for gross negligence. (Dkt. No. 1-1.) For the reasons set forth below, the undersigned recommends that the Court deny Defendants' Motion for Summary Judgment with respect to Plaintiff's claims for gross negligence against Defendant SCDC. The undersigned further recommends that the Court exercise supplemental jurisdiction over these state law claims under 28 U.S.C § 1367(c).

The SCTCA provides that "a governmental entity is not liable for a loss resulting from responsibility or duty including but not limited to supervision, protection, control, confinement, or

custody of any . . . prisoner, inmate, or client of any governmental entity, *except* when the responsibility or duty is exercised in a grossly negligent manner."[14] S.C. Code Ann. § 15–78–60(25) (2005) (emphasis added). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. It is the failure to exercise slight care." *Jinks v. Richland Cty.*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003) (internal citation omitted). "The term is relative and means the absence of care that is necessary under the circumstances." *Moore by Moore v. Berkeley Cty. Sch. Dist.*, 326 S.C. 584, 591, 486 S.E.2d 9, 13 (Ct. App. 1997). To plead the following elements to state a claim for gross negligence, a plaintiff must show: (1) a duty of care owed to the plaintiff by the defendant; (2) a breach that duty by a grossly negligent act or omission; and (3) damages proximately resulting from the breach of duty. *See Cockrell v. Lexington Cty. Sch. Dist. One*, No. 3:11-CV-2042-CMC, 2011 WL 5554811, at *5 (D.S.C. Nov. 15, 2011). Gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference. *Bass v. S.C. Dep't of Soc. Servs.*, 414 S.C. 558, 571, 780 S.E.2d 252, 259 (2015).

The Complaint alleges that SCDC "acted in a negligent, grossly negligent, reckless, willful and wanton manner" in violation of the SCTCA by "allowing uncontrolled violence in the correctional institution, . . . failing to provide protection and security for the Plaintiff, [and] . . . in failing to discipline its correctional officers for violations of SCDC policies and procedures." (Dkt. No. 1 at 15–16.) Defendants argue that Plaintiff relies on "conclusory allegations" to argue that "any named SCDC employee or agent exercised his or her responsibilities and duties in a grossly negligent manner." (Dkt. No. 3 at 45-1 at 20.)

---

[14] Defendants argue that "SCDC is granted immunity and protected from suit under the [SCTCA]." (Dkt. No. 45-1 at 19.) However, the SCTCA clearly excludes acts of gross negligence from this immunity. *See* S.C. Code Ann. § 15–78–60(25) (2005).

Here, Plaintiff relies on the same evidence to support both his § 1983 claims and his state law claims. This evidence has been detailed above and discussed at length in the context of Plaintiff's Eighth Amendment claims. For the same reasons the undersigned recommends summary judgment be denied on Plaintiff's Eighth Amendment claims, summary judgment should also be denied to SCDC on the state law claims. *See A.P. ex rel. Bazerman v. Feaver*, No. 04–15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008) ("[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."). More specifically, there is a genuine issue of material fact as to whether Defendant Leatherwood, an SCDC employee, left Plaintiff's wing unattended and unlocked, despite knowledge that an attack was going to occur. In addition, the evidence in the record indicates that Lee was suffering a severe staff shortage at the time of Plaintiff's assault, correlating with high incidents of assault and contraband. (Dkt. No. 51-6.) Also, as discussed above, the Roth Report states "[s]ecurity staffing levels have been a critical concern at Lee for an extended period. . . . [A] significant decrease in front-line security (FLS) staffing levels began in 2012 and had continued to decline through the middle of 2017." (Dkt. No. 65-10 at 98.) The Report documents "an extremely high number of fatal incidents" at Lee between 2009 and 2018. (*Id*. at 103.)

While the Roth Report was published after Plaintiff's attack, the Roth Report in and of itself is not the critical evidence here. Rather, it is the information underlying and contained within the Roth Report that demonstrates longstanding issues with staffing levels, contraband, and inmate-on-inmate assaults at Lee. Construing the evidence in the light most favorable to Plaintiff, there is at least a question of fact as to whether SCDC supervisory officials would have been aware of the information contained in the Roth Report prior to the assault at issue.

Defendants' arguments to the contrary are without merit. Specifically, Defendants argue that Plaintiff's gross negligence claim "is based on two invalid deductions of fact, best articulated in the maxims 'post hoc, ergo proper hoc' and 'res ipsa loquitor.". (Dkt. No. 45-1 at 20.) Defendants argue that Plaintiff relies on these maxims—which translate to "after this, therefore, on account of this" and "the thing speaks for itself"—because "Plaintiff does not offer any evidence . . . that SCDC or any employee committed any wrongdoing, error, or omission." (*Id.* at 21.) Defendant further argues that there is a lack of evidence tending to show causation. (*Id.* at 22.)

For the reasons discussed above, the undersigned cannot agree that there is no record evidence to support Plaintiff's gross negligence claim against SCDC. Specifically, there is a question of material fact as to whether Defendant Leatherwood, an employee of SCDC, acted with deliberate indifference, and the Roth Report demonstrates that Lee was experiencing a severe staff shortage, contraband issues, and higher than acceptable rates of assault prior to the incident. Further, the undersigned finds that there is a genuine issue of material fact as to whether it was reasonably foreseeable that a severe staff shortage, combined with high incidents of contraband and assault, would probably result in an inmate being attacked by other inmates. *See Hubbard v. Taylor*, 339 S.C. 582, 589, 529 S.E.2d 549, 552 (Ct. App. 2000) ("[I]t is not necessary for the defendant to have contemplated the particular event which occurred. . . . it is sufficient if the defendant should have foreseen that his negligence would probably cause injury to someone.").

Because questions of fact exist as to whether SCDC failed to give the care necessary under the circumstances alleged in this action and therefore acted in a grossly negligent manner, *see Moore by Moore*, 326 S.C. at 591, the undersigned recommends that summary judgment be denied with respect to Plaintiffs' gross negligence survival action against SCDC. *See Bass*, 414 S.C. at

571 (gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference).

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment (Dkt. No. 45) based on Plaintiff's failure to exhaust administrative remedies and **REMAND** Plaintiff's state law claims to Lee County.

**IN THE ALTERNATIVE**, it is **RECOMMENDED** that the Court **GRANT IN PART AND DENY IN PART** Defendants' Motion for Summary Judgment (Dkt. No. 45) on the merits. More specifically, summary judgment should be denied on the merits as to Plaintiff's § 1983 deliberate indifference claim against Leatherwood and Plaintiff's state law claim for gross negligence against SCDC. The remainder of Plaintiff's claims against Leatherwood and SCDC should be dismissed with prejudice.

**IT IS SO RECOMMENDED.**

April 16, 2021
Charleston, South Carolina

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).